# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

FREDERICK EDSON ALFORD, JR.,

    *Petitioner*,

vs.

JAMES M. SCHOMIG, *et al.*,

    *Respondents.*

2:02-cv-1520-KJD-LRL

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits on the claims remaining before the Court.

### *Background*

As acknowledged in the first amended petition, on December 22, 1991, petitioner Frederick Alford, Jr. entered his ex-wife's trailer in Las Vegas, Nevada and killed her new boyfriend, Johnny Richardson, by cutting his throat. Alford initially was convicted in a capital murder trial of first degree murder with use of a deadly weapon. After the guilty verdict, the State and Alford entered into a stipulation pursuant to which the State withdrew its intent to seek the death penalty and the defense agreed to imposition of two consecutive life sentences without the possibility of parole. Petitioner was sentenced accordingly.[1]

---

[1]See #21, at 1-2; #25, Exhs. 36 & 44.

This first conviction was overturned on direct appeal, however, on the ground that the information provided insufficient notice of the State's intent to pursue a felony murder theory. Thereafter, Alford was charged by an amended information with first degree murder with use of a deadly weapon, both on a premeditation theory and a felony murder theory based upon perpetration of a burglary.  During its opening statement at petitioner's second trial, the State referred to three letters from petitioner to his ex-wife urging her to lie in her testimony about the status of their relationship and about key facts regarding the killing.  Shortly thereafter, following the State's first witness, petitioner entered an *Alford* plea,[2] on a second amended information, to a first degree murder charge standing alone without the weapon enhancement, home invasion and subornation of perjury.  A later motion to withdraw the plea was denied. Alford was sentenced to consecutive sentences of life with the possibility of parole on the first degree murder charge and two ten year sentences on the remaining charges.[3]

Petitioner raises, *inter alia*, a number of claims of ineffective assistance of counsel, including a claim that trial counsel in the second trial was ineffective for failing to review and address the letters prior to the trial.  The background for this claim and the other claims in the petition begins at the first trial.

Ann Alford, petitioner's former wife, testified at the first trial as a witness for the State. She testified as follows.[4]

She and petitioner were married on December 30,1988.  They had lived together, however, for approximately three years before that time; and they had two children together prior to the marriage. #23, Ex. 31, at 146 & 210.

---

[2] *See North Carolina v. Alford*, 400 U.S. 25, 37-38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)(holding that a defendant can enter a valid guilty plea while still maintaining his innocence where there is a factual basis for the plea and the plea is voluntary, knowing, and intelligent).

[3] ##25-27; Exhs. 51, 63, 80, 82, 83 (at 23-26), 94 & 99 (at 11 & 21).

[4] The Court makes no credibility findings or other factual findings regarding the truth or falsity of the testimony or other evidence presented, and it summarizes the evidence solely as background to the issues presented.  Further, the Court does not summarize all of the evidence presented.  The Court instead summarizes evidence pertinent to or providing background to the issues in this matter.

Both before and after the marriage, however, the relationship was a rocky one.  Ann Alford testified initially on cross that there had been "[p]robably two" separations prior to the marriage.  She further testified, however, that "[i]t was on and off all the time;" and she acknowledged that there had been several separations "if you want to count every single one, [as] there's been numerous occasions that I've had to leave for a night or two nights."  Two days before the marriage, Frederick Alford threw her clothes out the front door; and two days later they were married.  Ann Alford stated that "it was a roller coaster."[5]

They married in December 1988, three weeks after the birth of their second child.  The relationship continued to be a volatile one following the marriage; and the on again, off again temporary separations "didn't stop."  At one point, Ann Alford stayed in Massachusetts with friends.  At another point, she and the children stayed with her parents in Rhode Island for about a month.  Her father then sent for Frederick Alford because her father thought that she needed someone "to keep her in line;" and she voluntarily returned to Las Vegas with Alford.  At yet another point, Ann Alford took the children and went to stay with relatives in Texas.  Frederick Alford bought a house in Las Vegas while she was in Texas.  After about a month, the two reconciled; and Ann Alford and the children returned and moved into the new house with petitioner.  They lived together there until September 1990.[6]

In September 1990, Ann Alford left with the children and did not return to live with Frederick Alford again thereafter.  In October 1990, in connection with the separation, she obtained a restraining order.[7]

Ann Alford acknowledged that there was a point in time where they discussed reconciling and moving as a family to New York:

> There was a point – there was a point when he come back
> where we talked about working things out trying to get back

---

[5]#23, Ex. 31, at 212 & 220-21.

[6]*Id.*, at 217, 220-23 & 249-51.

[7]*Id.*, at 146-47 & 222-24.

1   together.  I was struggling – I was struggling with my babies and
2   he had a way of making things sound like paradise.

3            So, yeah, there was a point for a while where we talked
    about going to New York and getting back together as a family,
    and he was on his best behavior and was straightening out, and
4   he was really trying to make it work.

5            Then we got into a fight and he hurt me again, and I knew
    he was never gonna change.

6
7            And I wasn't going to keep getting hurt just so that my
    kids could have all the things he had to offer.  It wasn't worth it
    anymore.

8

9   #23, Ex. 31, at 224-25.

10       On June 7, 1991, Ann Alford obtained a final divorce decree, with Frederick Alford

11   having supervised visitation rights to see the children in her presence.[8]

12       Ann Alford testified that after the divorce she saw Frederick Alford when he was

13   present ostensibly for supervised visitation of the children.  He would focus on the children

14   for a few minutes; but he then would focus on her, pressing her for them to get back

15   together.[9]

16       At some point in 1991 after the divorce, Ann Alford began working at the Beetle Barn,

17   a Volkswagen repair shop in northeast Las Vegas; and at or around the same time she

18   moved into a trailer next to the shop.  She tried to keep Frederick Alford from finding out

19   where she lived, but he followed her home from church.[10]

20       She testified that, over and above their contact for supervised visitation, Frederick

21   Alford tracked her movements and repeatedly made unwelcome contact following the divorce.

22   He would call her repeatedly at work and at home, leave multiple messages on her answering

23   machine, follow her three to four times a week, and show up uninvited and unannounced at

24   her work and home.  At her place of work, other employees would have to ask him to leave

25   _____

26   [8]#23, Ex. 31, at 148.

27   [9]*Id.*, at 163-65.

28   [10]*Id.*, at 149-52 & 155.

-4-

1   after he became upset.  He would show up at her home at all hours, including 2:00 or 3:00

2   a.m.  He would knock on her bedroom window if she was asleep; and if she did not let him

3   in, he would rant and rave until she did.[11]

4        During the uninvited visits and calls, Frederick Alford would start off acting nice and

5   then often would become more and more angry.  The heated conversation then usually would

6   lead up to him saying:  "If I lose, you lose."  Ann Alford was concerned for her safety and that

7   of the children.[12]

8        Every time that they talked, petitioner wanted for them to get back together.  Ann Alford

9   testified that she had made up her mind to live her life without petitioner, and she testified that

10  she never stated to Frederick Alford following the divorce that they would remarry.  She

11  repeatedly denied in her testimony making any such statement that they would remarry to

12  Alford at any time after the divorce.  She further testified that they never had sexual relations

13  after the divorce.[13]

14       Ann Alford acknowledged on cross-examination, however, that they had separated

15  many times and that they had reconciled every time except the last time.  She further

16  acknowledged that it appeared that Frederick Alford's goal in late 1991 was for the family to

17  get back together and that it appeared that he believed that this would happen.  He

18  sporadically paid child support, paid additionally for other things, and co-signed the note when

19  Ann Alford purchased a vehicle.  She testified on redirect that they did not reconcile the last

20  time because of his physical and mental abuse of her.[14]

21       Ann Alford testified that petitioner "spent the night one time for a few days" in or around

22  October 1991.  She testified that he slept on the couch and that they did not have sexual

23  relations.  She testified that she made him leave "[b]ecause we got in a fight and he hurt me

24

25       [11]#23, Ex. 31, at 149-56 & 161.

26       [12]Id., at 150-53, 156, 161-62, 165 & 179-80.  See also id., at 203 (further statements).

27       [13]Id., at 162-65, 204 & 225-26.

28       [14]Id., at 148-49, 221, 226-27, 232-33, 249-51 & 253-54.

again." She stated: "I told him he was never going to change, and that I couldn't stand it anymore. That I never wanted him to come there again." He continued to show up uninvited at the trailer thereafter, however.[15]

During this time period, Ann Alford was dating other men. She went to a few church dances with a man from her church who had worked on her car. She and the children also went on a trip to Southern California with another man from church and his children. She also went to singles dances at the church. Frederick Alford knew about these dates and social activities, and he let her know that he did not like it. But he did not threaten the other men or otherwise seek to confront them to her knowledge.[16]

Johnny Richardson was a mechanic at the Beetle Barn who also had worked on Ann Alford's car. About a month before Frederick Alford killed him, Richardson and Ann Alford began dating.[17]

About two weeks before petitioner killed Richardson, Ann Alford brought the children to see Alford for visitation at his room in a northeast Las Vegas valley hotel. She testified that she would not allow Alford to come to the trailer anymore for visitation and that they usually would take the children out to eat or shopping.[18]

During this visit, Ann Alford told Frederick Alford that she was seeing Johnny Richardson. She told him "that we had been seeing a lot of each other and we were good friends, and that I really cared about him." Alford became very angry. He stated that he could not stand the thought of Ann Alford being with anyone else. He started slamming things around the hotel room, once again stating: "If I lose, you lose." Frederick Alford became angry to the point that Ann Alford had to take the children home early without going out for a meal or shopping. #23, Ex. 31 at 174-75, 178, 182 & 231-32.

---

[15]#23, Ex. 31, at 168-71 & 226.

[16]*Id.*, at 159-61 & 246-49.

[17]*Id.*, at 159-60, 171-73 & 229-31.

[18]*Id.*, at 173-74 & 228-29.

1   Also during this same visit, Ann Alford saw that Frederick Alford had a brown-handled

2   folding pocket knife.  Ann Alford asked him about the knife, stating to him that he never had

3   carried a knife before.  He responded that she had all of the kitchen knives and that he

4   needed "something to cut things with."[19]

5   Ann Alford testified that, thereafter, Frederick Alford "just was always angry" and that

6   "[i]t seemed like quite often we ended up talking about" Johnny Richardson.  There was no

7   doubt in her mind that Alford knew that she was dating Richardson.[20]

8   On or about Thursday, December 19, 1991, Ann Alford and Frederick Alford went

9   Christmas shopping with the children.[21]

10   On Saturday evening, December 21, 1991, Ann Alford had a planned date with Johnny

11   Richardson in which the two of them were going together with her children to the church

12   Christmas party.  Ann Alford testified that she told Frederick Alford that she was going to the

13   party with Johnny Richardson and that he was very angry with her because she was not going

14   with him.  She stated that he said that "it was his family and he should be there with us."[22]

15   Ann Alford and Richardson went to the Christmas party with her children from

16   approximately 7:00 to 9:00 or 9:30 p.m.  On the way back, they picked up the babysitters, Lisa

17   Larimer and Michelle Smith.  They dropped the babysitters and the children off at the trailer,

18   and Alford and Richardson then went out bowling by themselves.  When they returned to the

19   trailer at about 1:30 a.m., everyone was asleep or appeared to be asleep.  They went back

20   to Alford's bedroom.  They talked for a while, and they had sexual relations.  They eventually

21   fell asleep, with 6:30 a.m. being the last time that Alford recalled seeing.[23]

22   / / / /

23   ────────────────

24   [19]#23, Ex. 31, at 175-76.

25   [20]*Id.*, at 176-78.

26   [21]*Id.*, at 227-28.

27   [22]*Id.*, at 180-81 & 184.

28   [23]*Id.*, at 184-91 & 237-38.

At about 7:30 a.m., Ann Alford awoke partially to the sound of the babysitters talking. A brief second later the bedroom door came crashing down, breaking loose from its top hinges and falling onto a night stand behind the door. Frederick Alford was standing in the doorway. Alford did not appear to be surprised or shocked to see her in bed with Johnny Richardson. He instead looked "very determined" and "very angry."[24]

Frederick Alford said "What the f— is this?" Ann Alford asked him "to please get out of the room, and I would come out and talk to him." Frederick Alford responded "What if I don't feel like it?" Then, "in an instant he just jumped on the bed and he was on top of" Richardson, who had been sleeping before Alford crashed in the door.[25]

Ann Alford jumped up from the bed, grabbed her robe, and yelled for the babysitters to call 911. As she was running from the room to talk to 911, she saw Frederick Alford straddled over Richardson with his hands on his face. The men were struggling. She did not see a knife in Alford's hand at that time, and she had not seen a knife in his hand prior to that when he crashed in the door. She was not specifically looking to see if he had something in his hand, but she acknowledged that she expected that she would have noticed if he would have had a knife in his hands.[26]

While she was on the phone with the 911 operator, Ann Alford heard the men banging against the wall and she heard Richardson telling Frederick Alford to calm down, to just calm down. A short time later, she heard a strange gurgling sound; and she dropped the phone and ran to the bedroom.[27]

In the bedroom, she saw Frederick Alford on top of Richardson, slashing him with a knife. It was the same knife that she had seen Alford with two weeks before at his hotel room. She saw Alford slash or stab Richardson "a good three or four times" with the knife. It

[24]#23, Ex. 31, at 191, 199-200 & 239-40.

[25]Id., at 191-92 & 199.

[26]Id., at 192-93, 240-41, 254 & 256.

[27]Id., at 193-94 & 241-42.

1  appeared from her viewpoint behind Alford that he was striking him in the chest with the knife;
2  but when Richardson raised up momentarily, she saw "a lot of blood" coming from his neck
3  area.  Frederick Alford acted determined, and Ann Alford had no doubt that he intended to
4  kill Johnny Richardson.[28]

5  Ann Alford pulled Frederick Alford off of Richardson and tried to help Richardson, but
6  the "blood was just coming out of him."  Frederick Alford, standing at the foot of the bed, then
7  said, calmly and without apparent emotion: "It's over.  I did it now, and now I'm going to do
8  it to myself."  He then sliced his left wrist with the knife.[29]

9  Ann Alford ran back to the phone.  She told the operator and dispatcher that
10 Richardson "was hurt really bad," was in need of medical attention, and was making a strange
11 sound.  While she was on the phone, Frederick Alford said to her: "Annie, come kill me, come
12 kill me."  The noise coming from Richardson then stopped and Ann Alford started calling his
13 name.  Frederick Alford then said to her, in a normal tone of voice: "Johnny's dead, Annie.
14 I killed him.  And now I'm going to kill myself.  No, you come do it.  You come do it."[30]

15 Ann Alford stayed on the phone until the police arrived as directed by the 911 operator.
16 Frederick Alford stated that he loved her, that he did it because he loved her, that "all he
17 wanted was his family back," and that "if he can't have it, then he just wants it to be over."[31]

18 Ann Alford testified that Frederick Alford had not been invited to her home that
19 morning.  She testified that the front door to the trailer would not lock securely because it had
20 some new weatherstripping.  Someone on the inside would think that it was locked, but it
21 could be pulled open from the outside even though the doorhandle was locked.[32]

22 / / / /

23 _____

24 [28]#23, Ex. 31, at 194-95, 198-99, 201-02 & 242.

25 [29]*Id.*, at 194-95 & 242-43.

26 [30]*Id.*, at 195-97 & 244-45.

27 [31]*Id.*, at 197, 244 & 252-53.

28 [32]*Id.*, at 200 & 202-03.  Additional testimony by Ann Alford regarding later events is summarized *infra*.

1    Officer Gary Casper of the Las Vegas Metropolitan Police Department ("Metro") and

2 his backup officer were the first police officers to arrive at the scene and enter the trailer.  He

3 arrived at the scene at 8:01 a.m.  When he entered the trailer, Ann Alford was in the living

4 room with the two babysitters.  Ann Alford told him that her ex-husband had just stabbed

5 another man and that he was in the back of the trailer.  Officer Casper called out to Frederick

6 Alford to come out to the living room without the knife so that the waiting paramedics could

7 look at Richardson.  Alford said from the bedroom: "I just killed a man, now I'm going to kill

8 myself" and then "God forgive me for what I've done."[33]

9    With his weapon drawn, Officer Casper moved down the hall toward the bedroom

10 followed by his backup.  As he approached, he heard a gurgling sound.  When he reached

11 the bedroom doorway, he saw Alford sitting on the end of the bed and Richardson's body

12 lying toward the head of the bed.  At that point, he saw Alford slash his own throat, with a left

13 to right cut with his right arm, "in a very violent manner" and "a determined look on his face

14 to kill himself."  It appeared that he was using all of his strength to do it.  He did not appear

15 to be intoxicated on drugs but instead "was intent on completing the job that he was doing."

16 Officer Casper had been demanding that Alford drop the knife, but Alford had not complied.

17 Casper testified that Alford "acted like I wasn't even there, he was looking straight ahead and

18 cutting his throat."  He saw Alford cut his throat approximately three or four times.  Alford then

19 passed out and the knife fell about three inches from his hand.  Officer Casper moved the

20 knife away from Alford with his nightstick and took control of the weapon.  He then allowed

21 the paramedics in.[34]

22    Metro Officer Nancy Howe was Officer Casper's backup in the trailer.  Immediately

23 after the paramedics were allowed in, she took a statement from Ann Alford, who was in

24 shock, basically hysterical, and very shaken up.  Alford stated "that her ex-husband had

25 entered the front of the house, kicked the door in and cut her boyfriend."  Officer Howe asked

26

27    [33]#23, Ex. 32, at 108-112, 115 & 118-21.

28    [34]Id., at 113-15, 117 & 121-22.

Ann Alford whether Frederick Alford had access to the residence and she said "no, he didn't." Howe examined the bedroom door which "appeared like it had been kicked or knocked open" and "was damaged" with the "top . . . hanging off."[35]

Metro identification specialists Michael Perkins and Sheree Norman also observed the damaged condition of the bedroom door.  Perkins stated that "what had happened at some point from probably some force, it had been broken off of the top hinge of what was attaching it to the wall, the bottom hinge was still attached a little bit on the door."  He further described the condition of the door as follows:

> The door at the time that I arrived was leaning up against the wall, the wall that's right behind where the door is now [in the picture being discussed at trial].  The bottom hinge was still intact on the door, was a little bit loose, and the top hinge was broken off, and the top of the door was leaning away probably three to five inches at the distance at the hinge.

Norman similarly observed that "the top hinge on the door was broken and the door was hanging."  Another witness for the State, Sherry Rollins, additionally provided corroborating testimony regarding how the door was damaged after the attack and had not been in that condition previously.[36]

As for the front door to the trailer, Perkins testified:

> . . . the front door, we had a great amount of difficulty securing it when we left the residence.  You can close the door and you think it will be latched and you would pull on the handle and the door would pop open without any force.
>
> . . . . .
>
> . . . after we had completed our investigation and we were preparing to secure the residence, we had a lot of difficulty in getting that door to lock.  When you would close the door and the door would latch, you would hear it latch.  You could pull on the handle and the door would open right back up without even turning it.  You would just pull straight out and it would open.

#23, Ex. 31, at 143; Ex. 32, at 174.  Two other State fact witnesses, Rhonda Bower and

---

[35]#23, Ex. 32, at 92-100.

[36]#23, Ex. 31, at 143 (Perkins); Ex. 32, at 163 (Norman) & 172-73 (Perkins); #24, Ex. 33, at 67-68 (Rollins).  Additional corroborating testimony from the babysitters is summarized *infra*.  Additional testimony from Rollins on other matters also is summarized *infra*.

1  Sherry Rollins, testified that the door had a locking or latching problem prior to the attack.

2  Bower responded affirmatively to a question as to whether the apparently locked front door

3  could be opened with "a little force." Rollins also agreed that the locked door could be opened

4  before the attack with "some force," and she elaborated that Frederick Alford could open the

5  locked door but that both she and Ann Alford had tried and neither could open the door.[37]

6       The babysitters, Lisa Larimer and Michelle Smith, testified collectively as follows.

7       While they were at the trailer babysitting on the Saturday evening, they did not receive

8  any calls from Frederick Alford asking if he could come over the following day. Larimer

9  cleaned the bedroom while Ann Alford and Johnny Richardson were out on their date. She

10 did not see a knife in the bedroom.[38]

11      At about 7:30 a.m. on the following morning, Frederick Alford came in unannounced.

12 He did not knock on the door, and they did not open the door to let him in. He instead opened

13 the door and walked into the trailer unannounced. He appeared angry and confused, "[l]ike

14 he always looks," according to Larimer. Alford asked them: "Is Annie home?" and "Is she in

15 her room?" One or both responded with a simple "yes" to each question.[39]

16      Alford then started walking back to the bedroom at a faster than normal pace. They

17 did not see a knife in his hand. Smith, however, testified that she saw Alford pat his jeans

18 jacket pocket as if checking to make sure something was there.[40]

19      Smith testified that Alford "busted down" or "kicked in" the bedroom door first with a

20 loud crash. Larimer, however, did not testify to hearing any loud crash. Both testified that

21 they then heard Alford say: "What the f---- is this?" Then they heard arguing and the sounds

22 of a struggle. Smith testified that Ann Alford stated a number of times "Fred, stop, don't" while

23

24      [37]#23, Ex. 32, at 69 (Bower); #24, Ex. 33, at 68, 98-99, 101 & 107 (Rollins). Warren Stephens'
   testimony on the condition of the door prior to the attack appears to have been based entirely on hearsay

25 without any direct personal knowledge prior to the attack. See Ex. 32, at 235-36, 247 & 248-49.

26      [38]#23, Ex. 32, at 5 & 9-10 (Larimer); id., at 33-34 (Smith).

27      [39]Id., at 10-12, 17-18 & 21-23 (Larimer); id., at 35-36 (Smith).

28      [40]Id., at 12 & 23-24 (Larimer); id., at 36-37, 44-46, 51, 53 & 56 (Smith).

-12-

1  Frederick Alford kept repeating "What the f— is this?" and "What's going on?"  Smith also

2  glanced down the hallway toward the bedroom at one point.  She saw Frederick Alford moving

3  toward Richardson, who was lying on the bed.  She did not see a weapon in his hand at that

4  point.[41]

5      When Ann Alford yelled from the bedroom for them to call 911, Larimer already was

6  in the process of doing so "[b]ecause [it] sounded like there was a big problem" and "[i]t

7  sounded like maybe a police officer might help a little bit."  Larimer testified that, a little while

8  after Ann Alford first ran out of the bedroom to talk to the 911 operator, Ann Alford yelled

9  "Johnny" to the bedroom and Frederick Alford yelled back "Johnny's dead."  Smith testified

10 that Frederick Alford said repeatedly "it doesn't matter, he's already dead."  Larimer, but not

11 Smith, testified that she heard Frederick Alford say to Ann Alford "I love you" and words to the

12 effect of "It's my turn."[42]

13     Myron Judkins testified that he lived nearby and also was at the church Christmas party

14 on the evening of December 21, 1991.  On his way home that evening, at or shortly after

15 11:30 p.m., he saw a blue pickup truck with a man sitting inside parked near the Beetle Barn

16 and Ann Alford's trailer.  He identified Frederick Alford's truck as the vehicle that he saw.[43]

17     After the killing, Metro Officer Howe observed at the crime scene that Richardson's

18 body, which was not clothed, "had one extremely large gash, large and deep . . . across the

19 whole front of his neck and then two smaller ones underneath . . . [and] also a large gash

20 across his chest and across the inner part of his thigh."[44]

21     Metro Detective Robert Leonard was assigned that morning to investigate the killing

22 of Johnny Richardson.  In his years as an investigator, he had investigated 232 murders, of

23

24 [41]#23, Ex. 32, 12-13 & 23-24 (Larimer); *id.*, at 36-39, 43, 45-47, 49-50 & 51-56 (Smith).  Smith did not
   put in her voluntary statement on December 22, 1991, that she heard the loud noise of the door being busted
25 in or kicked in.  She was steadfast in her testimony, however, that that is what she heard.

26 [42]*Id.*, at 13-17 (Larimer); *id.*, at 39-43, 46 & 48 (Smith).

27 [43]*Id.*, at 77-91.

28 [44]*Id.*, at 100-02.

which 36 involved a knife as the actual cause of death.  He testified that, of the wounds that he observed on Richardson's body at the scene, only a slicing or stabbing wound on the back side of the left forearm conceivably could have been a defensive wound.  The remaining wounds "were unusual in the simple fact that they were actual cutting wounds specifically applied, not the normal stab wounds."  He stated that "these are actual long slicing type cuts, and this is what was unusual about this particular case."  One of the cutting wounds to the neck "was to the point where the entire trachea and esophagus were exposed."[45]

The coroner's chief medical examiner, Dr. Giles Sheldon Green, M.D., conducted the autopsy of Johnny Richardson's body.  He noted several cutting and one or two stabbing wounds.  There were at least three cutting wounds across the neck; a nine inch long, one inch deep cutting wound down the left side of the abdomen; and a similar obliquely oriented seven inch long, one inch deep cutting wound across the right thigh below the groin.  There additionally were several more minor wounds, including a superficial cutting wound across the left upper arm above the elbow and a small shallow stab wound to the back of the left forearm below the elbow.  Richardson's neck was cut very deeply across a distance of four-and-a-half inches by a "large major cutting wound."  The trachea, or upper part of the airway, was cut completely in two.  The right common carotid artery, a large artery that supplies blood to the head, "was almost cut in two, not quite, but effectively completely transected."  Dr. Giles opined that Richardson's death was a direct result of a cutting wound to the neck.  The medical examiner was able to recover "very, very little" blood from the body.[46]

Dr. Fereydoon Tofigh, M.D., examined and treated Frederick Alford on December 22, 1991 at the University Medical Center trauma center.  Alford presented with lacerations to the neck and a laceration of the left wrist.  Further examination of the neck lacerations during surgery revealed a laceration of the external jugular vein, which was bleeding and was ligated "because it's not very important."  Alford had two additional deep lacerations in the neck.  The

---

[45]#24, Ex. 33, at 12-22 & 25.  See also #23, Ex. 32 (photo of body in relation to premeditation issue).

[46]#23, Ex. 32, at 129-30, 134 & 136-49.

-14-

first was at the level of the thyroid and "was quite deep" and involved one-third of the trachea. Another "more extensive" laceration was below the hyperthyroid cartilage and that went all the way through the trachea, almost but not completely transecting it.  An ear, nose and throat surgeon was called in to repair the trachea.  Alford's injuries were not life-threatening with medical intervention.  However, if he had not received medical treatment, it was possible that he eventually could have bled to death from the laceration of the jugular vein, which was open completely and possibly may not have stopped bleeding on its own.[47]

After the police released the crime scene, Sherry Rollins and Warren and Nancy Stephens, who were friends of Ann Alford, went to the trailer to start cleaning up.  They found messages from Frederick Alford from the previous day and night on Ann Alford's telephone answering machine.  According to the testimony of Sherry Rollins, Warren Stephens and Ann Alford, Frederick Alford left up to as many as ten messages in succession, one after the other. The messages would begin with a pleasant tone of voice, but after no one answered the message became more angry and laced with expletives.  The messages, *inter alia*, repeated the prior refrain of "If I lose, you lose."  In one of the final messages, Alford said that "if you don't pick up the f—ing phone, you're history."  They did not provide the answering machine tape to the police, however; and the tape ultimately either was lost or recorded over.[48]

Ann Alford additionally testified – at the first trial – about efforts by Frederick Alford to get her to lie about their relationship and about key facts concerning the killing:

> Q    Now, have you heard from the defendant since December the 22d, 1991?
>
> A    Yes.
>
> Q    How has he corresponded with you?  Was it by the telephone or through letters?
>
> A    Both.

---

[47]#24, Ex. 33, at 5-12.

[48]#23, Ex. 31, at 205-08 (Ann Alford); *id*., Ex. 32, at 216-19 & 239-43 (Warren Stephens); #24, Ex. 33, at 64-66 & 89-93 (Sherry Rollins).

1     Q    Both?  Has he ever talked to you about your
2         testifying here today?

      A    Yes.
3
4     Q    What has he said about you being a witness today
        in this courtroom?

5     A    Things like he wanted me to say the knife was on
6        the headboard of the bed.  He wanted me to tell
        them that we were going to get married and go
7       back to New York.

8     Q    That you and the defendant were going to get married?

9     A    Yes.

10    Q    Is that true? Had you ever said that to him?

11    A    No.

12    Q    Was the knife on the headboard of the bed?

13    A    No.

14    Q    Did he say anything else with regards to what you
        should testify to today or how you should testify?

15    A    He wanted me to tell the jury that I was leading both
16       him and Johnny on.  That he had no reason to
        believe that I would be with Johnny because I made
        him believe that we were going to get back
17       together.

18    Q    Did he ever tell you that his life was in your hands?

19    A    Yes.

20    Q    What did he say?

21    A    He said when we were together, I was in control,
22       and now I guess you're in control and my life is in
        your hands, and you're the only one that can help
23       me.

24    Q    Did he ask you to tell this jury things that weren't true –

      A    Yes.
25
      Q    – in order to help him?
26
      A    Yes.
27
28    Q    Did he ask you to tell the jury that you invited him over that
        day?

A    On that particular one, he never said that it was a lie.  He just wrote things like, you know, I called that morning and, you know, I talked to the baby-sitters. Stuff like that.

#23, Ex. 31, at 203-05.  See also *id.*, at 208-09; #24, Ex. 33, at 69-70 (Ann Alford's statements to Sherry Rollins about the letters and about pressure not to testify).  When Ann Alford was asked a few questions later whether she still was afraid of Frederick Alford, she responded that "[i]f there's a word beyond fear, it would be that."  *Id.*, at 209.

The remaining prosecution and defense witnesses were directed primarily to the state of the relationship between Frederick Alford and Ann Alford at the time that Frederick Alford killed Johnny Richardson.

Another regular babysitter for Ann Alford, Rhonda Bower, testified for the State.  She testified that when Frederick Alford came to the trailer, he would lead Ann Alford by the arm into another room and they would argue.  Frederick Alford otherwise would try to put his arm around her and she would shift her body away to the side.  Ann Alford appeared to be frightened of him, and she stated to Bower several times that she was.  Often when Bower was there babysitting, Frederick Alford would drive by in his truck multiple times and/or would call repeatedly.  One time his driving by frightened Bower to the point that she called for her father to come over.  She acknowledged on cross-examination that she was babysitting at the trailer one night when Frederick Alford and Ann Alford were out together.  However, she did not remember exactly when it was and she did not know whether Frederick Alford was still there when she stopped by the next morning.[49]

Warren Stephens testified for the State.  Stephens was the owner of the Beetle Barn and the trailer, and he was a bishop affiliated with the church that Ann Alford had been attending.  Johnny Richardson was his nephew.  Stephens testified that when Frederick Alford was at the trailer Ann Alford "was afraid, standoffish" and "[s]he tried to stay away from him as much as possible."  Ann Alford was afraid of him, and she told Stephens that "she

_____

[49]#23, Ex. 32, at 57-77.

1    wanted to be rid of him" and that "[s]he didn't want to have anything to do with him." Frederick

2    Alford behaved in a controlling and demanding manner, and he was angry at times. The last

3    time that Stephens talked to Frederick Alford, about a week before Alford killed Johnny

4    Richardson, Alford said to Stephens "that she was his girl and that he was going to get her

5    back; nobody else was going to get her." Stephens testified that from his conversations with

6    Frederick Alford it was evident both that Alford knew that Ann Alford was dating Johnny

7    Richardson and that Alford did not like it.[50]

8        Sherry Rollins substantially corroborated Ann Alford's testimony in a number of

9    respects. According to her testimony, Frederick Alford was domineering and possessive; and

10   he demanded Ann Alford's attention. The two broke up and got back together multiple times.

11   On the occasions when Ann Alford moved out and stayed with Rollins, Frederick Alford would

12   come beating on her door angrily. Ann Alford later moved into the trailer in an effort to avoid

13   being found by Frederick Alford, but he found out where she lived by following Rollins.[51]

14       Thereafter, when Frederick Alford came over for child visitation, he would play with the

15   children for a few minutes and then focus his attention on Ann Alford. She allowed him to

16   sleep on the couch at the trailer for a few nights when he did not have a place to stay, but she

17   consistently denied having sex with him after the divorce. Ann Alford told Rollins that she

18   wanted to marry Johnny Richardson; she never said that she wanted to remarry Frederick

19   Alford. Both Ann Alford and Rollins were afraid of Frederick Alford.[52]

20       Sherry Rollins testified to three encounters with Frederick Alford that were of particular

21   note in the time period leading up to the time that he killed Johnny Richardson.

22   Approximately two months before the killing, Rollins encountered Frederick Alford waiting

23   outside Ann Alford's trailer. Rollins testified that Alford was very angry. He stated to her "that

24   they were having sex, that they were having a relationship, that they were going to be

25   _____

26   [50]#23, Ex. 32, at 200-01, 205-06, 208, 213-14, 223, 228-30 & 247-48.

27   [51]#24, Ex. 33, at 52-58, 60 & 80-82.

28   [52]*Id.*, at 55, 57, 59-61, 63, 75, 83, 86-87, 97 & 99-100.

remarried and he didn't understand why she was dating other men and he was just very upset because she wasn't there when he came to see her."[53]

A month before the killing, Frederick Alford struck a different tone and presented a different picture of his relationship with Ann Alford, when he purportedly accidentally ran into Rollins in a grocery store parking lot. Alford was very apologetic for all of the problems that he had caused, and he stated that they he and Ann Alford really had not been having sex together. He stated that it would be best if he went to help his father with his business in New York, and he indicated that he was planning to do so.[54]

The weekend before the killing, however, Rollins once again encountered Frederick Alford parked outside Ann Alford's trailer. Rollins found him there when she went to check on her children who were babysitting for Ann Alford. This time, Frederick Alford angrily stated: "She's playing games. She's sleeping with me and now she's going out with them. She is playing games with me."[55]

Rollins' testimony differed from Ann Alford's testimony in that she testified that they told her together that Frederick Alford paid the down payment for Ann Alford's car, as opposed to merely cosigning the loan. She additionally testified that she knew of the two shopping with the children as well as without the children when they were Christmas shopping for toys.[56]

Rollins additionally testified on cross-examination that she had been concerned about Ann Alford leading Frederick Alford on:

> A    I was very concerned about Annie leading him on, and I would constantly talk to them about it.
>
> Q    Because I believe, as you and I when we met you said Annie would kind of lead him on as Fred would do similar with her. Is that accurate?

---

[53]#24, Ex. 33, at 70-71 & 104.

[54]*Id.*, at 71-72, 83-84 & 103-04.

[55]*Id.*, at 61-62, 84-86, 102-03 & 109-10.

[56]*Id.*, at 80-81 & 95-96.

-19-

| | | | |
|---|---|---|---|
| 1 | | A | In the sense that Fred would not always be willing |
| 2 | | | to give her money or help with the kids unless Annie acted friendly to her [sic], and she felt like |
| 3 | | | she had to do in order to get the assistance that they needed.  I believe there was limitations. |
| 4 | | Q | But they would both kind of do things to – |
| 5 | | A | Annie always told me that she wanted a father for |
| 6 | | | her children and so she went to many extremes to try and give him a chance so that he could be there |
| 7 | | | for the children, and if that meant being a little nice to him, then she would do that and then when the |
| 8 | | | situation was where she was uncomfortable, then she would have to have him leave. |

9   #24, Ex. 33, at 100-01.  See also *id.*, at 102 & 107-08 (related redirect and recross).

10       The defense relationship witnesses included Frederick Alford's mother and stepfather,

11   Catherine and Willis Moses, who were from Seneca, New York.  They testified collectively that

12   Frederick Alford and Ann Alford were planning, in September or October 1991 subsequent

13   to their divorce, to move to New York together, that Ann Alford also had told them this herself,

14   and that they had obtained brochures from area junior colleges for Ann Alford at her request.

15   On cross-examination, however, neither had knowledge of an alleged incident involving Ann

16   Alford and her younger child that allegedly caused her to leave Frederick Alford and put an

17   end to the New York plans.[57]

18       Joanie and Michael Abraham also testified for the defense.  Joanie Abraham had

19   known Frederick Alford for twelve years, since she was fifteen.  The Abrahams testified

20   collectively that Frederick Alford stayed at their home for a time both before and after the

21   divorce.  Ann Alford and the children often visited Frederick Alford at their home.  Ann Alford

22   frequently would stay overnight there and have sexual relations with Frederick Alford, both

23   before and after the divorce, while the children were playing or asleep.  They also used the

24   Abraham's house a number of times to "play house" while the Abrahams were away.[58]

25       / / / /

26

27   [57]#24, Ex. 33, at 118-31 (Willis Moses); *id.*, at 132-43 (Catherine Moses).

28   [58]#24, Ex. 35, at 10-16 (Michael Abraham); *id.*, at 19-29 (Joanie Abraham).

1    Joanie Abraham further testified that Ann Alford told her after the divorce, "several

2    months" before December 22, 1991, that they were planning to move to New York to work

3    things out and become a family again.  She acknowledged on cross-examination, however,

4    that she had "seen  something from both sides" in terms of evidence of physical abuse – in

5    response to questioning from the State as to whether she was aware of an alleged incident

6    involving Ann Alford and her younger child that allegedly caused her to leave Frederick Alford

7    and put an end to the New York plans.[59]

8    Joanie Abraham also testified that Ann Alford told her on December 22, 1991, later

9    on the same day as the killing, that Frederick Alford came over to the trailer that morning

10    because the two of them had made plans to go out to breakfast.[60]

11    A defense investigator, Arlan Justice, additionally testified that Ann Alford stated to

12    him:

13
14        She told me that she had told Fred that she was seeing someone. She didn't tell him that it was serious, nor did she tell him that it was Johnny [Richardson].

15

16    #24, Ex. 33, at 144 & 148.

17    In closing argument at the first trial, the State relied upon Frederick Alford's attempts

18    to get Ann Alford to lie:

19
20        He asked Annie to say that the knife was already in the bedroom on the headboard so that I didn't come in there with the knife.  Make it look
21        good for me.  Also say that you invited me over. That will help, too.

22        Now, if the defendant had killed Johnny Richardson in the heat of passion as [defense
23        counsel] would have you believe, why is he asking Ann Alford to lie for him?  This is consciousness of
24        guilt, ladies and gentlemen.

25    Ex. 24, Ex. 35, at 157-58.

26

27    [59]#24, Ex. 33, at 37-41; see also *id.*, at 18-19 (Michael Abraham).

28    [60]*Id.*, at 34-37.

1   After hearing the evidence at the first trial, the jury returned a verdict of guilty of first

2   degree murder with use of a deadly weapon.  The State and the defense stipulated to the

3   imposition of two consecutive life sentences without possibility of parole, and the matter thus

4   was not presented to the jury in a penalty phase hearing for consideration of possible

5   imposition of the death penalty.[61]

6   The conviction was overturned on direct appeal, however, on the ground that the

7   information provided insufficient notice of the State's intent to pursue a felony murder theory.

8   *Alford v. State*, 111 Nev. 1409, 906 P.2d 714 (1995).

9   On remand for retrial, Alford initially decided to represent himself.  Ultimately, however,

10  new defense counsel from the state public defender's office, Peter LaPorta, was appointed

11  to represent petitioner to replace counsel from the county public defender.  Nancy Lemcke

12  later joined LaPorta as second chair defense counsel.[62]

13  The State's opening statement at the second trial included the following:

14

15  Now, December 22nd, 1991, was not the last time Ann
    Alford had contact with the defendant.  The evidence will show
16  that Ann Alford's nightmare would continue.  The defendant
    constantly called her, wrote her letters, told her how to lie in court,
    how to lie to fool the DA, to fool the jury, how to lie to get him out
17  of this hole that he's in.  How to prove to you that it wasn't
    premeditated.  "You got to lie," and those are in letters written by
18  this defendant telling his wife or his ex-wife to perjure herself.

19  "Tell them that the knife was already there because, if they
    believe I came in with that knife, it's premeditated murder, and we
20  don't want that.  And if the DA asks you a question that's going to
    make me look bad, say, 'I don't remember, I forgot. . . . It's been
21  a while.'  So they'll believe that.  You need to say we were getting
    remarried.  That is what I thought, but what you intended.  If not,
22  then kiss my ass good-bye."  — and I apologize for the language,
    but that's directly out of a letter from the defendant.
23
    "Most important, if you have to lie through your teeth, tell
24  how our relationship was just as good as always.  You need to
    say we were having sex just the same as always.  Tell them I was
25  coming over there, and I expected to have sex that morning.  You

26  _____

27  [61]#25, Exhs. 36 & 44.

28  [62]See #25, Exhs. 59 & 60.

need to convince them, the jury, that we were a couple, and that you gave me no reason to expect what happened or what I was to find there.  No matter how much it hurts you, you need to convince the jury that you were the cause of this happening.  You need to say that you misled both me and Johnny.  You need to make yourself out to be a slut, if that's what it takes, and that's what it's going to take.  I'll make sure the people who really count know the difference.  I promise.  Not only that, but if my family knows that you've done everything you could to help me, you'll have them for life.  On the other hand, if you refuse to help me by what you say, I can't be responsible for the consequences."

In the letter he states, "Metro cops and DA's and all kinds of officials lie in court.  It's a known fact.  Nobody can prove anything against you as long as you keep to the story.  I'll be honest.  The DA will probably threaten you, and if he doesn't like what you say, and will probably put you on the spot in that witness seat.  Don't worry, keep calm.  If you think an answer may harm me, say, 'I don't remember.  I'm not sure.'  Try not to look at me in court.  If you don't like what the DA is doing or asking, use your emotions or ask for a recess.  First of all, you can't mention these things to my attorney because then they will know that I've communicated with you.  So if they ask at trial if you ever talked to me, say, 'No.'  You have to in order to convince the jury I haven't coerced you.  Same with these letters.  Now, I've denied knowing anything about you two, and it has to stay that way.  You've got to say that.  If you want to help me, you need to do as I say.  So I went ahead and told my attorneys that the knife was on the headboard when I entered the trailer.  That I had put it there before, and you will verify this.  It's not premeditated murder if they believe the knife was already there, and I didn't bring it in.  That's very important."  I'm quoting.  "Don't do the morally right thing for Johnny when it's not going to bring him back."

This defendant has manipulated Ann Alford from day one and continues to do so even prior to this trial.  He is still sending her letters, telling her how to testify, how to fool you, how to fool the Court, how to fool the DA.  Ms. Alford turned those letters over to our office after she received them.

Now, he's up against the wall.   He's facing life imprisonment without the possibility of parole, and he'll do anything and say anything to get out of this jam he's in.  The jam he put himself in.  He's encouraging Ann Alford to commit a felony.  He's encouraging her to lie under oath, which is perjury.

#26, Ex. 83, at 23-26.

After the State's first witness, petitioner entered an *Alford* plea to first degree murder

without the weapon enhancement, home invasion, and subornation of perjury.

Any additional factual background pertinent to the individual claims presented is set

forth below in the discussion of the respective claims.

-23-

1

***Standard of Review***

2      The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly

3  deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 117 S.Ct. 2059,

4  2066 n.7(1997).  Under this deferential standard of review, a federal court may not grant

5  habeas relief merely on the basis that a state court decision was incorrect or erroneous.  *E.g.,*

6  *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Instead, under 28 U.S.C. § 2254(d),

7  the federal court may grant habeas relief only if the decision: (1) was either contrary to or

8  involved an unreasonable application of clearly established law as determined by the United

9  States Supreme Court; or (2) was based on an unreasonable determination of the facts in

10  light of the evidence presented at the state court proceeding.  *E.g.*, *Mitchell v. Esparza*, 540

11  U.S. 12, 15, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003).

12      A state court decision is "contrary to" law clearly established by the Supreme Court only

13  if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

14  if the decision confronts a set of facts that are materially indistinguishable from a Supreme

15  Court decision and nevertheless arrives at a different result.  *E.g., Mitchell,* 540 U.S. at 15-16,

16  124 S.Ct. at 10.  A state court decision is not contrary to established federal law merely

17  because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has

18  held that a state court need not even be aware of its precedents, so long as neither the

19  reasoning nor the result of its decision contradicts them.  *Id.*  Moreover, "[a] federal court may

20  not overrule a state court for simply holding a view different from its own, when the precedent

21  from [the Supreme] Court is, at best, ambiguous."  *Mitchell*, 540 U.S. at 16, 124 S.Ct. at 11.

22  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme

23  Court precedent is not contrary to clearly established federal law.

24      A state district court decision constitutes an "unreasonable application" of clearly

25  established federal law only if it is demonstrated that the state court's application of Supreme

26  Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."

27  *E.g., Mitchell*, 124 S.Ct. at 12; *Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003).

28      / / / /

-24-

To the extent that the state court's factual findings are challenged intrinsically based upon evidence in the state court record, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, the AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

If the state court factual findings withstand intrinsic review under this deferential standard, they then are clothed in a presumption of correctness under 28 U.S.C. § 2254(e)(1); and they may be overturned based on new evidence offered for the first time in federal court, if other procedural prerequisites are met, only on clear and convincing proof. 393 F.3d at 972.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Davis*, 333 F.3d at 991.

### Governing Substantive Law

The Supreme Court decisions in *Tollett v. Henderson*, 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), and *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), sharply curtail the possible grounds available for challenging a conviction entered following a guilty plea. As the Court stated in *Tollett*:

> . . . . [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from

-25-

> counsel was not within the [constitutional] standards [established for effective assistance of counsel.]

411 U.S. at 267, 93 S.Ct. at 1608.   Accordingly, "while claims of prior constitutional deprivation may play a part in evaluating the advice rendered by counsel, they are not themselves independent grounds for federal collateral relief." *Id.*

In *Hill*, the Court held that the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to challenges to guilty pleas based on alleged ineffective assistance of counsel.  474 U.S. at 58, 106 S.Ct. at 370.   Accordingly, a petitioner seeking to set aside a guilty plea due to ineffective assistance of counsel must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness; and (2) that the defective performance resulted in actual prejudice.  474 U.S. at 58-59, 106 S.Ct. at 370.

On the performance prong, the question is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from counsel's perspective at the time.  In this regard, the reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.  *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

On the prejudice prong, as a general matter under *Strickland*, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *E.g., Beardslee*, 327 F.3d at 807-08.   Application of this general principle to the specific context of a guilty plea leads to the requirement that the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

Under *Hill*, a challenge to the voluntariness of a guilty plea potentially may be based upon a claim of ineffective of assistance of counsel in proceedings prior to the plea.  As the Court observed:

> . . . .  For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence,

> the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial. . . . . As we explained in *Strickland v. Washington, supra*, these predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the "idiosyncrasies of the particular decisionmaker." Id., 466 U.S., at 695, 104 S.Ct., at 2068.

474 U.S. at 59-60, 106 S.Ct. at 370-71. Thus, an attorney's unprofessional error in failing to develop a meritorious defense may serve as a basis for overturning a guilty plea and conviction if, viewed objectively, there is a reasonable probability that, but for the error, the petitioner would not have pled guilty and would have insisted on going to trial.

### *Discussion*

### *Ground 1:   Ineffective Assistance of Trial Counsel*

In Ground 1, petitioner alleges that he was denied effective assistance of counsel because his appointed trial counsel: (a) failed to argue in a motion in limine prior to the second trial that the Double Jeopardy Clause barred further prosecution on a felony murder theory based upon a burglary charge; (b) failed to secure a complete psychiatric evaluation prior to trial; (c) failed to reasonably communicate with petitioner and to prepare for trial; (d) failed to timely review and address petitioner's letters to his ex-wife; (e) recommended that he plead to charges of home invasion and subornation of perjury; and (f) failed to present crucial evidence at, to request an evidentiary hearing on, or call witnesses in support of the motion to withdraw guilty plea. On claims (a) through (e) above, Alford alleges that he would not have entered the plea that he did or would have gone to trial but for these failures.

### *Ground 1(a): Double Jeopardy Challenge to Felony Murder Theory*

In Ground 1(a), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to argue in a motion in limine prior to the second trial that the Double Jeopardy Clause barred further prosecution on a felony murder theory based upon

-27-

a burglary charge.  Petitioner alleges that reasonably competent counsel would have argued that the felony murder/burglary charge in the amended information was barred by double jeopardy "because the Nevada Supreme Court had held on direct appeal from Alford's first trial that there was insufficient evidence to support that charge."[63]

On direct appeal following the first trial and conviction, Alford raised no argument that the evidence presented at the first trial was insufficient to sustain a conviction to support a felony murder/burglary charge.  Rather, Alford raised the issue of "whether the district court's instruction to the jury, after the close of the evidence, which permitted them to convict Mr. Alford of first degree murder under a theory of which he had no prior notice violated Mr. Alford's right to be informed of the nature and cause of the accusation against him guaranteed by the sixth amendment of the United States Constitution."[64]

The Supreme Court of Nevada, in a published opinion, stated its holding on this issue in the opening paragraph of the opinion:

> In this appeal we hold that a first-degree murder conviction based on felony-murder cannot be sustained unless the indictment or information puts the defendant on notice of this charge and states facts which support the conclusion that the murder was committed during the commission of an identified felony.

*Alford v. State*, 111 Nev. 1409, 1410-11, 906 P.2d 714, 714-15 (1995).  The court overruled numerous prior decisions to the contrary.  111 Nev. at 1415 n.4, 906 P.2d at 718 n.4.

The remainder of the text of the Nevada Supreme Court's lengthy opinion was devoted exclusively to a discussion of the holding that the indictment or information must put the defendant on notice that the prosecution would be based upon felony murder.  The state high court closed its decision with the following disposition of Alford's appeal:

> Because Alford did not receive adequate notice of the charges upon which his conviction was based, we reverse the

---

[63]#21, at 13-14.

[64]#25, Ex. 46, at 15; see also *id.*, at 1 & 14-17; Ex. 48, at 2-4.

-28-

conviction and remand the matter to the district court for a new trial.

111 Nev. at 1415, 906 P.2d at 717-18.

The portion of the opinion relied upon by petitioner herein is not found in the text of the opinion but instead is found in a footnote following a reference in the text to the "supposed burglary of the trailer home." The footnote reads as follows:

> There is *serious question* here as to whether there is evidence upon which a jury could have found burglary beyond a reasonable doubt. Alford knew the trailer home and had visited it before. He entered the home peaceably and began talking with the babysitters. Whether or not he broke down the bedroom door where his wife was, this *does not look very much like* a burglary case. The State does not specify in the proffered instruction or in its appellate briefs just what felony Alford was supposed to have had in mind when he committed the burglary that supports the murder charge in this case. *Because we rest this opinion on Alford's not receiving fair notice of the charges, we do not elaborate on the point discussed here*, that there is no evidence to support the giving of a burglary/felony-murder instruction.

111 Nev. at 1413 n.3, 906 P.2d at 716 n.3 (emphasis added). The final disposition of the appeal, again, was remand for a new trial.[65]

Before the second trial, defense counsel filed a motion in limine seeking to preclude argument that the murder was committed during a burglary. The motion did not rely upon double jeopardy or an alleged finding by the Supreme Court of Nevada on direct appeal that the evidence was insufficient to support the charge. The motion instead argued that a felony murder charge could not be based upon a burglary charge that was premised upon entry with the intent to commit the felony of murder.[66]

In his *pro se* state post-conviction petition, petitioner claimed:

> A major contributor to Petitioner's decision to plead guilty was the failure of counsel to properly [interpret] and understand

---

[65]In a petition for rehearing, the State requested, *inter alia*, that the *dicta* in footnote 3 of the opinion be deleted, and the State provided argument as to how the evidence and law supported a felony murder theory based upon burglary. Alford opposed the petition, stating, *inter alia*, that the last sentence of the footnote was "of no practical consequence" and deletion of the footnote "would leave the central holding of the opinion intact." The state high court denied rehearing without elaboration. See #25, Exhs. 52, 54 and 56.

[66]#25, Ex. 75; see also Ex. 78, at 9-11.

-29-

> the Nevada Supreme Court's opinion in Alford v. State, 111 Nev. 1409 (1995), when counsel filed and argued the Motion in Limine to Preclude Felony-Murder Argument, whereas, the Supreme Court made clear that when the state is seeking a conviction based on the felony-murder rule, the State must give notice in the charging document and state specific facts which would support such a charge.  In this case the charging document did not give specific facts which would support felony murder, and even the underlying offense was questionable as recognized by the Nevada Supreme Court in *Alford*, wherein they recognize the fact that there is a serious question as to whether there was any evidence which would support a conviction for burglary or home invasion.  Id. at 1415 n.3.  Nevertheless, trial counsel did not bring this issue up in the motion or argue it any manner whatsoever.

#27, Ex. 116, at 9; see also *id.*, at 22-24.  Petitioner argued therein that trial counsel had rendered ineffective assistance when he failed "to recognize the complete deficiency of the Amended Information under the Alford standard," particularly given the statements in footnote 3 of the opinion regarding the strength of the evidence.  *Id.*, at 23.  At no point did petitioner allege that trial counsel was ineffective for failing to argue in the motion in limine that the Double Jeopardy Clause barred further prosecution on a felony murder/burglary charge due to insufficiency of the evidence at the first trial.  *Id.*

The state district court, in its decision denying the petition, did not address any claim of ineffective assistance based upon a failure to assert a double jeopardy bar.  The district court instead addressed the claim that was presented in the petition, and the court held that the language in the amended information was sufficient to place petitioner on notice that the State was seeking a felony murder conviction.[67]

On appeal from the denial of post-conviction relief, counsel was appointed for petitioner.  Counsel's brief in the Supreme Court of Nevada tracked the *pro se* arguments made in the district court.  Counsel argued that trial counsel had been ineffective for failing to challenge the adequacy of notice given by the "bald statement" in the amended information that the crime was committed "during the perpetration or attempted perpetration of a burglary."  Counsel referred to footnote 3 of the opinion on direct appeal only as making

---

[67]#27, Ex. 119, at 7, ¶¶ 17-19.

-30-

1    "further clear" trial counsel's "failure to recognize the complete deficiency of the Amended
2    Information under the Alford standard."   At no point did state post-conviction appellate
3    counsel assert that trial counsel was ineffective for failing to argue in the motion in limine that
4    the Double Jeopardy Clause barred further prosecution on a felony murder/burglary charge
5    due to insufficiency of the evidence at the first trial.[68]

6        The Supreme Court of Nevada listed a claim that trial counsel was ineffective for
7    "failing to adequately prepare Alford's motion in limine to preclude a felony murder-argument"
8    as one of six claims of ineffective assistance of trial counsel.   The state high court rejected
9    the six claims on the basis that "Alford has not demonstrated that the district court's findings
10   of fact are not supported by substantial evidence or are clearly wrong."   The court did not
11   otherwise discuss any of the six claims independently or with greater specificity.[69]

12       In this Court, petitioner maintains that Ground 1(a) is subject to *de novo* review rather
13   review under the deferential review under the AEDPA standard because the claim was not
14   addressed on the merits in the state courts, which instead "denied this claim on the ground
15   that the Amended Information adequately provided notice of the charge."[70]

16       There is a simple reason, however, why the state courts did not address a claim that
17   trial counsel was ineffective for failing to argue that the Double Jeopardy Clause barred
18   further prosecution on a felony murder/burglary charge upon due to insufficiency of the
19   evidence at the first trial.   Petitioner never presented such a claim to the state courts.   A side-
20   by-side comparison of the claim presented by federal habeas counsel with the claim
21   presented in the state courts leads to the conclusion that Ground 1(a) was not fairly presented
22   to the state courts and is not exhausted.   The claim was not merely ignored; it instead was
23   never presented.   However, respondents nonetheless have not challenged exhaustion of the
24   claim.   The Court exercises its discretion to proceed to the merits of the unexhausted claim,

26   [68]#27, Ex. 129, at 21-23.

27   [69]#27, Ex. 132, at 3-4.

28   [70]#53, at 9.

-31-

given the late stage of these proceedings and the lack of merit of the claim.  *See Granberry v. Greer,* 481 U.S. 129, 134-35, 107 S.Ct. 1671, 1675,  95 L.Ed.2d 119 (1987).  The Court will apply a *de novo* standard of review to the claim because the state courts never considered, or were given the opportunity to consider, the unexhausted claim on the merits.

In the final analysis, the moving premise for Ground 1(a) is erroneous.  It simply is not true, as petitioner urges, that "the Nevada Supreme Court had held on direct appeal from Alford's first trial that there was insufficient evidence to support that charge."  Instead, the court only raised a "serious question" in that regard in *dicta*, and the court expressly eschewed resting its decision on the issue, which was not one of the issues on appeal.  The court further expressly did not elaborate beyond the questions posed in the footnote; and the court clearly made no holding, on an issue not raised on appeal, that the evidence was insufficient to sustain a conviction fo felony murder.  Petitioner's selective quotation and selective emphasis in this matter notwithstanding, the *dicta* in note 3 of the Nevada Supreme Court's opinion made no holding that the evidence was insufficient to sustain a conviction based upon felony murder.  The entire moving premise of the double jeopardy argument that petitioner maintains that trial counsel should have presented therefore is unfounded.

Petitioner relies upon *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988), and *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).  Petitioner relies upon *Lockhart's* description of *Burks* as holding that, "[b]ecause the Double Jeopardy Clause affords the defendant who obtains a judgment of acquittal at the trial level absolute immunity from further prosecution for the same offense, it ought to do the same for the defendant who obtains an appellate determination that the trial court *should* have entered a judgment of acquittal."  488 U.S. at 39, 109 S.Ct. at 290 (emphasis in original).

It is readily evident from reading the above quote in context, however, that the *Lockhart* Court was saying only that a holding on appeal that the evidence is insufficient has the same effect as an acquittal in the district court:

> *Burks* was based on the view that an appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant

was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury. *Burks*, 437 U.S., at 16-17, 98 S.Ct., at 2149-2150. Because the Double Jeopardy Clause affords the defendant who obtains a judgment of acquittal at the trial level absolute immunity from further prosecution for the same offense, it ought to do the same for the defendant who obtains an appellate determination that the trial court *should* have entered a judgment of acquittal. *Id*., at 10-11, 16, 98 S.Ct., at 2146-2147, 2149. The fact that the determination of entitlement to a judgment of acquittal is made by the appellate court rather than the trial court should not, we thought, affect its double jeopardy consequences; to hold otherwise "would create a purely arbitrary distinction" between defendants based on the hierarchical level at which the determination was made. *Id*., at 11, 98 S.Ct., at 2147.

488 U.S. at 29, 109 S.Ct. at 290 (emphasis in original). Absolutely nothing in the discussion in either *Lockhart* or *Burks* signifies that a reviewing court's discussion of the sufficiency of the evidence in *dicta*, without reaching a decision on the issue, has the same effect as a holding on the issue. There was no reversal for insufficient evidence in the present case.

Petitioner cites no apposite authority in any way tending to establish that a double jeopardy objection would have had any realistic chance of success in this case if raised by trial counsel in the motion in limine. Petitioner accordingly has not established either deficient performance by trial counsel in this regard or that, viewed objectively, there is a reasonable probability that, but for the claimed error, petitioner would not have pled guilty and would have insisted on going to trial. Petitioner accordingly cannot establish a viable claim of ineffective assistance of counsel under *Strickland* and *Hill*.

Ground 1(a) therefore does not provide a basis for federal habeas relief.

### Ground 1(b): Psychiatric Evaluation

In Ground 1(b), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to secure a complete psychiatric evaluation prior to trial.

At the first trial, the defense subpoenaed a psychiatrist, Dr. Jack Jurasky, to testify to Alford's mental state at the time of the killing. On the morning of the last day of the trial, a Friday, the defense reported outside the presence of the jury that Dr. Jurasky was unable to appear that day because he had a very severe case of the flu. The defense requested that the matter be held over, following the completion of the remaining testimony, to the following

1   Monday so that Dr. Jurasky could testify.  The defense reported that Dr. Jurasky had

2   conducted an evaluation of Alford, and the defense made a proffer of his expected testimony

3   from his report.  According to the report, Dr. Jurasky opined that Alford's case might be one

4   of pathologic love.  Dr. Jurasky noted the former wife's reports of beatings and Alford's own

5   depiction of himself in an interview as being a loving and devoted victim of the wife, who he

6   felt drove him to desperate measures culminating in the killing.  He opined that Alford "could

7   have been in the throes of powerful emotions of rage, jealousy, betrayal, et cetera, and will

8   not have been the first, nor the last, to react violently to his wife's infidelity (remember he said

9   they were planning to remarry)."  The state district court denied the defense request, and the

10  court excluded the testimony on the basis of relevancy and as going to an ultimate issue of

11  intent reserved to the jury.[71]

12       On direct appeal after the first trial, petitioner raised the issue of whether the state trial

13  court erred in prohibiting the defense from presenting testimony from the psychiatrist

14  regarding Alford's state of mind.[72]

15       On this issue, the Supreme Court of Nevada did render a holding in a footnote:

16           Alford's sole defense, which focused on *mens rea* at the
         time of the killing, was frustrated by the trial court's refusal to
17       permit the psychiatrist who examined Alford to testify as to
         Alford's state of mind. The court ruled that the defense could not
18       present the proffered state-of-mind testimony because the
         defendant's intent was an ultimate issue of fact for the jury to
19       decide. This ruling was, of course, error of major consequence.
         *See, e.g., Southern Pacific Co. v. Watkins*, 83 Nev. 471, 487, 435
20       P.2d 498, 508 (1967) (The court recognized that "[t]he clear trend
         in the law of evidence is [ ] that an expert witness, in his field of
21       expertise may testify to matters which embrace the ultimate issue
         to be decided by the triers of fact.") NRS 50.295 expressly
22       permits the admission of expert testimony concerning a
         defendant's intent at the time of committing a homicide. The
23       court's ruling on this point effactually aborted Alford's attempt to
         defend himself against charges that he had killed his former wife's
24       boyfriend deliberately and in cold blood.

25  111 Nev. at 1411 n.1, 906 P.2d at 715 n.1.

26  _____

27  [71]#24, Ex. 35, at 3-9.

28  [72]#25, Ex. 46, at 1 & 12-14.

1       Prior to the second trial, on June 12, 1996, new defense counsel moved for an order

2 approving fees for a psychiatric evaluation by Dr. Franklin Master, a psychiatrist that had

3 worked in the past with the state public defender.  Counsel's affidavit attested that it was "of

4 the utmost importance that counsel have a complete psycho-neurological review of Mr. Alford

5 to assist him in presenting an effective defense and mitigation;" that it was "quite possible that

6 counsel will call the hired expert psychiatrist to testify on Mr. Alford's behalf during the trial;"

7 and that the foregoing was "essential to Mr. Alford's defense."  Counsel sought expert fees

8 for Dr. Master to conduct "a complete review of any and all discovery sent to Dr. Master,

9 including, but not limited to, prior school records, criminal juvenile records, prison record(s)

10 and police reports involving the incident" and to "spend a full work day interviewing Mr. Alford."

11 The state district court approved the request.[73]

12       At an October 11, 1996, calendar call, the matter was continued, with the state district

13 court's approval, one week pursuant to a prior agreement between counsel.  The State

14 requested discovery as to any psychiatric evidence that the defense would be presenting.

15 Defense counsel responded that "we have retained Dr. Masters just for that purpose, and Dr.

16 Masters talked to Mr. Alford approximately two months ago."[74]

17       On October 18, 1996, the state district court issued an order submitted by defense

18 counsel authorizing a contact visit with petitioner by Dr. Master.[75]

19       Also on October 18, 1996, defense counsel filed a motion in limine to allow the

20 testimony of Dr. Master.  The motion stated that Dr. Master "will opine that the Defendant

21 acted in the heat of passion, and correlatively, without the premeditation/deliberation

22 necessary to sustain a First Degree Murder conviction."[76]

23       / / / /

24 _____

25 [73]#25, Exhs. 65 & 66.

26 [74]#25, Ex. 71.

27 [75]#25, Ex. 73.

28 [76]#25, Ex. 74.

1    At the opening of the trial on October 21, 1996, the state trial court took up pending

2    motions and other preliminary matters outside the presence of the jury.  The court granted the

3    motion in limine to allow Dr. Master's testimony, as law of the case.  The State requested a

4    copy of Dr. Master's report.  Defense counsel responded:

> Dr. Masters is scheduled to testify according to the
> subpoena Thursday afternoon.  Dr. Masters in June saw Mr.
> Alford.  He sent me a one-page evaluation, maybe two pages.
> He is faxing over a copy of that to us this afternoon, and upon its
> receipt I'll make sure that [the State] has a copy of that.

8    #25, Ex. 78, at 3.  Defense counsel listed Dr. Master as one of the witnesses to be called by

9    the defense.  *Id.*, at 14 & 21.

10   Petitioner entered a plea after the State's first witness.  Neither Dr. Master nor any

11   other defense witness was called to testify.

12   In his *pro se* state post-conviction petition, petitioner claimed that his trial counsel was

13   ineffective for failing to adequately prepare and secure a complete psychiatric evaluation by

14   Dr. Master in advance of the second trial. #27, Ex. 116, at 20-22.  Petitioner attached, *inter*

15   *alia*, his supporting purported affidavit, which was not notarized, in which he stated:

> 5.  That my trial counsel did not investigate into how Dr.
> Master's psychiatric evaluation was coming along in order to be
> prepared for trial, or he would have known that Dr. Master had
> only interviewed me on one occasion for 2 hours on August 4,
> 1996, at which time Dr. Master indicated to me that the interview
> was for the sole purpose of a preliminary evaluation to see if he
> could assist with the defense.  Nevertheless, I did not see Dr.
> Master again, and as such, the psychiatric evaluation was never
> completed for trial.

> 6.  That as of the third day of my trial on October 23, 1996,
> I had still not seen Dr. Master again in order to complete the
> psychiatric evaluation and have it ready and prepared for trial.

23   #27, Ex. 116, Petitioner's Ex. "D" thereto (voir dire was conducted the first two trial days).

24   Alford did not submit any affidavits or other evidence, however, tending to establish

25   either: (a) the content of Dr. Master's initial report or that the report provided insubstantial

26   support for the defense state of mind theory; (b) the additional evidence that would have been

27   developed on an allegedly more complete evaluation; or (c) the inability of Dr. Master to

28   complete any allegedly incomplete evaluation prior to his testimony in the defense case.

-36-

The state district court rejected the claim on the following basis:

> With regard to Defendant's claim of his counsel's failure to prepare and secure adequate psychiatric evaluation, Defendant submits only conclusory statements that are repelled by the record. Hargrove, supra. [*Hargrove v. State*, 100 Nev. 498, 502-03, 686 P.2d 222, 225 (1984).] By filing a motion in limine to allow the testimony of Dr. Masters, it appears to this Court that the defense counsel intended to call him as a witness and were satisfied with the evaluation they had received. Defendant has made no showing of prejudice and is unable to meet the requirements of Strickland to show ineffective assistance of counsel. As such, this issue is dismissed.

#27, Ex. 119, at 6-7, ¶ 16.

The Supreme Court of Nevada rejected this claim in the group of claims that it rejected on the basis that "Alford has not demonstrated that the district court's findings of fact are not supported by substantial evidence or are clearly wrong."[77]

The state courts' rejection of Ground 1(b) was not an objectively unreasonable application of *Strickland* and *Hill*. It is axiomatic that the petitioner must establish both deficient performance and resulting prejudice. The claim of prejudice that petitioner presented to state courts was wholly speculative, in that he did not support the petition with any affidavits or other evidence[78] tending to establish either the content of the psychiatrist's initial report, the additional evidence that an allegedly more complete psychiatric evaluation by Dr. Master would have produced, or the inability of defense counsel to present a viable defense in its case in chief based upon Dr. Master's psychiatric testimony due to the alleged delay. That is, establishing only that counsel allegedly could have done more sooner does not establish either that the psychiatric evidence actually developed was inadequate or that a complete and sufficient defense on this point could not have been presented at trial. It thus was not unreasonable to conclude that petitioner had failed to come forward with sufficient supporting facts to establish that, viewed objectively, there was a reasonable probability that,

---

[77]#27, Ex. 132, at 3-4.

[78]N.R.S. 34.370(4) requires that affidavits, records, or other evidence supporting the allegations in the petition must be attached with the state petition.

1   but for the claimed error, petitioner would not have pled guilty and would have insisted on
2   going to trial.  It therefore was not objectively unreasonable to reject the claim for failure to
3   assert critical facts with regard to prejudice.

4        Ground 1(b) therefore does not provide a basis for federal habeas relief.

5        ***Ground 1(c):  Communication with Petitioner and Preparation for Trial***

6        In Ground 1(c), petitioner alleges that he was denied effective assistance of trial
7   counsel when counsel failed to reasonably communicate with him and to prepare for trial.

8        As noted previously, prior to the second trial, new defense counsel from the state
9   public defender's office ultimately was appointed to represent petitioner in place of counsel
10  from the county public defender.  However, on March 13, 1996, petitioner initially refused to
11  allow the state public defender to be appointed to represent him.  After a *Faretta* colloquy, he
12  elected to represent himself on the charge of first degree murder with use of a deadly
13  weapon.  After a month passed, on April 15, 1996, he changed his mind and allowed the state
14  public defender to be appointed as his counsel.[79]

15       After only two months, however, by letter dated June 17, 1996, Alford advised defense
16  counsel that he was terminating the attorney-client relationship and that he had filed a
17  complaint with the state bar association.   On June 24, 1996, petitioner moved for the
18  withdrawal of defense counsel on the ground that counsel had done little or nothing to prepare
19  for the upcoming trial.  At the ensuing hearing on the motion, petitioner acknowledged that
20  he had refused to cooperate with the defense investigator when he came for a scheduled
21  visit, on the basis that he had filed a complaint with the bar association and a conflict existed.
22  The state district court denied petitioner's motion for withdrawal of counsel.   Petitioner
23  thereafter cooperated with defense counsel and the trial subsequently was continued to
24  October 1996.[80]

25       / / / /

26  _____

27       [79]#25, Exhs. 59 & 60.

28       [80]#25, Ex. 67; Ex. 69, at 6; Ex. 70.

1    At an October 11, 1996, calendar call, Alford again objected to continued

2    representation by the state public defender, alleging that counsel had failed to prepare for the

3    case, allegations that defense counsel strongly contested.  The matter was continued one

4    week per a prior agreement between counsel for the State and defense.[81]

5    In his state post-conviction petition, Alford alleged that his counsel failed to reasonably

6    communicate with him and to prepare for trial.[82]

7    In his supporting purported affidavit, Alford stated that he had only minimal contact with

8    defense counsel, the psychiatrist, and the investigator before trial.  He further stated that

9    defense co-counsel, Nancy Lemcke, stated to him that LaPorta had not reviewed the file,

10   which was in the same condition in which it had been received; that he had "pulled the same

11   c—" in a death penalty hearing that she had second-chaired with him a couple of months

12   before; that LaPorta did well considering the lack of preparation but could have spared the

13   defendant's life if he had prepared; that she was "p—ed off" at him; and that she could not

14   possibly be ready for trial.  Alford stated that on June 29, 1996, he gave the investigator a list

15   naming thirty-four potential witnesses but that it had been verified that only eight of these

16   witnesses were ever contacted.  Alford did not identify the remaining witnesses who were not

17   contacted or the content of their anticipated testimony.[83]

18   Petitioner also submitted copies of earlier sworn declarations from his motion to

19   withdraw guilty plea by Lemcke and the defense investigator, Jerome Dyer.  These

20   declarations pertained to the issue of the letters and did not provide corroborating factual

21   support for this claim.  In particular, Lemcke made no statements as to a general lack of

22   preparation by lead counsel, and Dyer made no statements regarding witness leads that were

23   not pursued.  #27, Ex. 116, Petitioner's Exhs. "A" and "B" thereto.

24   / / / /

25

---

26   [81]#25, Ex. 71.

27   [82]#27, Ex. 116, at 28-32.

28   [83]#27, Ex. 116, Petitioner's Ex. "D" thereto, at 2-5, ¶¶ 7-18.

1    Petitioner additionally submitted sworn declarations by his mother, Catherine Moses,

2   by her friend, Sharon Morehouse, and by his father, Frederick Alford, Sr.  The witnesses

3   attested to conversations that they had with petitioner prior to and at the start of the trial.

4   Collectively, the witnesses attested that petitioner said prior to the trial that he felt that his

5   attorneys were not prepared but he wanted to go to trial; that petitioner said that he had been

6   presented with a better plea offer prior to the trial, one life sentence with the possibility of

7   parole, but had rejected it; and that petitioner took the less favorable plea at trial only after the

8   State relied on the letters to his wife in opening statements.[84]

9    Petitioner submitted no declarations, affidavits or other evidence identifying the trial

10  witnesses that he alleges were not contacted or the content of their anticipated testimony.

11    The state district court rejected the claim on the following basis:

12

13         24.  Defendant's final contention that his counsel failed to
      adequately communicate with him and failed to prepare for trial
      is belied by the record and does not justify an evidentiary hearing.

14    Hargrove, supra.

15         25.  Defendant bears the burden of demonstrating that his
      counsel was not prepared.  Under Strickland, defense counsel

16    has a duty "to make reasonable investigations or to make a
      reasonable decision that makes particular investigations

17    unnecessary."  Strickland, at 691, 104 S.Ct. at 2066.  Here Mr.
      LaPorta's representations to the court on the record, make it clear

18    that he had conducted reasonable investigations, despite
      Defendant's unfounded allegations.

19

20         26.  Defendant's additional contention that Mr. LaPorta
      failed to communicate with him appears to stem more from a
      complaint as to the frequency of visits by Mr. LaPorta than a

21    failure to inform Defendant of specific information regarding his
      case.  To that extent, the Sixth Amendment does not guarantee

22    a meaningful relationship between the accused and his counsel.
      Morris v. Slappy, 461 U.S. 1, 13, 103 S.Ct. 1610, 1617 (1983).

23    "The Sixth Amendment guarantees every defendant the right to
      counsel and requires that counsel be adequate and effective, but

24    does not guarantee that every defendant will have a meaningful
      relationship with his counsel and does not guarantee counsel of

25    defendant's choice."  Barnes v. Housewright, 603 F.Supp. 330,
      331-332 (1985).

26

27
_____

28    [84]#27, Ex. 116, Petitioner's Exhs. "G", "H" and "I" thereto.

-40-

27.  Defendant has failed to meet his burden of proof to show ineffective assistance of counsel.  The record instead demonstrates that Defendant was uncooperative with counsel in his preparation for trial.  As such, this issue is dismissed.

#27, Ex. 119, at 8-9, ¶¶ 24-27.

The Supreme Court of Nevada rejected this claim in the group of claims that it rejected on the basis that "Alford has not demonstrated that the district court's findings of fact are not supported by substantial evidence or are clearly wrong."  #27, Ex. 132, at 3-4.

The state court decision rejecting this claim was not an objectively unreasonable application of *Strickland* and *Hill*.  Regardless of the conflicting statements concerning defense counsel's level of preparation, petitioner came forward with no evidence of resulting prejudice in support of this claim in the petition, as was required by state post-conviction procedure under N.R.S. 34.370(4).  The petition and supporting materials failed to identify the witnesses who allegedly were not contacted and the alleged need for their testimony, in a case that already had been tried to a verdict and judgment once before.  Petitioner therefore failed to come forward with evidence of prejudice of sufficient specificity to lead to the conclusion that, viewed objectively, there was a reasonable probability that, but for the claimed error, he would not have pled guilty and would have insisted on going to trial.

Indeed, petitioner's allegations and declarations, to the extent that they contained admissible evidence,[85] cut directly against his claim that the alleged lack of communication and preparation caused him to enter a plea rather than go to trial.  Petitioner undeniably was, as his father stated in his declaration, "well aware" of his own dissatisfaction with what he perceived to be inadequate communication and preparation by defense counsel; but he nonetheless intended to proceed to trial.  The declarations reflect that Alford did not change his mind until after the State's reliance in opening statements on his letters to his ex-wife.[86]

---

[85]Much of what was stated in the declarations likely would have been hearsay that would not have been admissible to prove the truth of the matter asserted therein.

[86]Petitioner also made allegations on this claim with respect to an allegedly more lenient plea offer allegedly made by the State prior to trial that he would have taken but for the ineffective assistance of

(continued...)

-41-

1    The state court decision rejecting this claim therefore was not an objectively
2    unreasonable application of clearly established federal law.

3    Ground 1(c) therefore does not provide a basis for federal habeas relief.

4    **Ground 1(d):  Petitioner's Letters to His Ex-Wife**

5    In Ground 1(d), petitioner alleges that he was denied effective assistance of trial
6    counsel when counsel failed to timely review and address petitioner's letters to his ex-wife that
7    the State referred to in opening statements.  In particular, petitioner alleges that trial counsel's
8    failure to review the letters constituted ineffective assistance because counsel accordingly
9    failed to move effectively to exclude the letters, failed to prepare to defend against them, and
10   failed to take them into account in plea negotiations.  Petitioner maintains that the letters
11   became a "devastating  bombshell" to the defense only because of trial counsel's lack of
12   preparation, and that, at the very least, defense counsel "could have negotiated a plea – very
13   likely a better plea –" if they had reviewed and considered the letters earlier.

14   Petitioner first raised a claim of ineffective assistance of counsel based upon a failure
15   to review the letters in a motion to withdraw plea that was filed before sentencing.  The motion
16   was filed by new appointed counsel not connected with the state public defender's office,
17   Patricia Erickson.  Petitioner claimed that he was prejudiced because he had rejected a more
18   favorable plea offer prior to trial pursuant to which he allegedly could have entered a plea only
19   to a charge of first degree murder without a weapon enhancement and would have been
20   sentenced to a single life sentence with the possibility of parole.[87]

21   / / / /

22

23   [86](...continued)
24   counsel.  Resolution of this particular claim does not appear in truth to turn upon these allegations, however.
     Petitioner alleges that he rejected the alleged offer and elected to proceed to trial despite being dissatisfied,
     as he apparently was from the very outset, with defense counsel's level of communication and preparation,
25   such that petitioner's claim is not even internally consistent in this regard.  Further, as noted in the text,
     petitioner cannot establish prejudice under the governing standard in *Hill*, which is an objective rather than a
26   subjective standard.  To the extent, if any, that the allegations regarding the allegedly more lenient offer have
     any material bearing on this claim, the Court adopts and incorporates the discussion regarding the alleged
27   offer, *infra*, under Ground 1(d), as if set forth *in extenso* herein.

28   [87]#26, Ex. 94.

-42-

1    Petitioner attached, *inter alia*, a sworn declaration by defense co-counsel, Nancy

2    Lemcke, together with his own sworn declaration.

3    Nancy Lemcke attested to the following.[88]  She began assisting LaPorta in mid-October

4    1996 for the upcoming trial.   The two lawyers divided up responsibility for the respective

5    witnesses between them, and Lemcke's primary witness for preparation for cross-examination

6    was Ann Alford.  Lemcke attached both a list showing the breakdown of responsibility and her

7    notes showing her anticipated cross-examination of Ann Alford.  Lemcke's plan was "to follow

8    a chronological examination of her contacts with the defendant in order to prove that on the

9    day of the killing of Johnny Richardson that Ann Alford was continuing her relationship with

10   defendant Frederick Alford and thus prove that when Frederick Alford arrived at the trailer he

11   was surprised to find Mr. Richardson in Ann Alford's bedroom."[89]

12   Several days before the start of the trial, LaPorta informed Lemcke that he had

13   received several letters from the prosecution and that she should review the letters.  LaPorta

14   did not discuss the content of the letters.  Lemcke retrieved the letters from LaPorta's desk,

15   but she did not review them prior to the State's opening statement.  She did not realize the

16   import of the letters until hearing the opening statement.  She stated that "it is my opinion that

17   these letters were devastating to the defense that I intended to present at trial."[90]

18   In a chambers conference, Lemcke and LaPorta challenged the introduction of the

19   letters as inadmissible other bad acts evidence as to which the State had not filed the

20   required pretrial notice.  The state trial judge rejected this challenge and indicated that he was

21   going to permit the State to introduce the letters.   Defense counsel then had a "lengthy

22   discussion" with petitioner regarding the impact of the letters on his defense, and he ultimately

23   decided to accept the offered plea.  Lemcke stated in her declaration that "it is my belief that

24

25        [88]In summarizing evidence, the Court again makes no findings of fact or credibility determinations as

26   to the truth or falsity of the evidence submitted, whether at trial or in other proceedings.

27        [89]#26, Ex. 94, Ex. "B" thereto and attachments.

28        [90]#26, Ex. 94, Ex. "B" thereto and attachments.

-43-

1   Mr. Alford finally entered his guilty plea because of the impact of the letters upon his
2   defense."[91]

3       Lemcke did not make any statement in her declaration that, before trial, the State had
4   made an offer pursuant to which petitioner could plead guilty to first degree murder and
5   receive a single life sentence with the possibility of parole.   Nor was any such sworn
6   statement by LaPorta offered in support of the motion.

7       Alford attested that on October 10, 1997, "Mr. LaPorta informed me that my case could
8   be negotiated if I would agree to enter a guilty plea to one count of first degree murder and
9   I would be sentenced to [a] life with the possibility of parole sentence on this charge."  Alford
10   attested that he was not informed before trial by anyone with the defense of either the
11   existence of the letters or of their impact on his defense.  He further attested that "[i]f Mr.
12   LaPorta had informed me of the existence of these letters, and had discussed the impact of
13   these letters on my defense, I would have agreed to enter a plea to one count of first degree
14   murder given the fact that I would be eligible for parole after incarceration of ten years."  He
15   attested that he entered a plea at trial because of the conversations with counsel that, for the
16   first time, "informed me of the impact that these letters would have on the defense of my case
17   . . . and made me able to comprehend the impact the letters would have on my defense."[92]

18       The State's opposition, *inter alia*, asserted:  "the State never made an offer of straight
19   First Degree Murder, Life with Parole.  Discussions were had concerning the possibility of
20   negotiating this case, but no offers were extended."  The opposition further asserted that
21   "[a]pproximately two weeks before the trial began, the State gave to defense counsel copies
22   of letters written by the defendant to Ann Alford."[93]

23       / / / /

24

---

25   [91]#26, Ex. 94, Ex. "B" thereto and attachments.  The defense investigator, Jerome Dyer, attested that
26   he did not receive the letters in discovery or at any other time prior to trial and that he was surprised when he
     heard about the letters in the State's opening statement.  *Id.*, Ex. "C" thereto.

27   [92]#26, Ex. 94, Ex. "F" thereto.

28   [93]#27, Ex. 95, at 5.

1    The state district court heard oral argument on the motion to withdraw.  Defense

2    motion counsel stated, *inter alia*, that the prosecutor had informed her that he received the

3    letters two weeks before he turned them over to defense trial counsel, *i.e.*, about a month

4    before trial.  Defense motion counsel further pointed to the State's failure to correct the

5    following statement by petitioner from a hearing ten days before trial:

6            THE DEFENDANT: . . . .  . . . .  I don't trust this man
         [LaPorta].  He's trying to convince me that I should plead to a first
7        degree murder conviction and that I would only have to do three
         years on a ten-to-life because I already have five years in.

8
9    #25, Ex. 71, at 4.  Counsel, however, did not quote LaPorta's immediately following response:

10           MR. LAPORTA: Judge, that is – this really [is] getting
         ridiculous.  That's absolute nonsense.  I took to him what was
         potentially a possible one.  He rejected it.  That was it.

11
12           . . . .  I have not attempted to convince this man to take a
         negotiation.  This is just barefaced misrepresenting things to you.

13   *Id.*, at 4-5.  At the motion hearing, the prosecutor, *inter alia*, reiterated that "there has been

14   no prejudice because no offer was ever extended to the defendant to [plead] guilty to one

15   count of first degree murder, life with."  The state district court denied the motion finding that

16   the plea was entered voluntarily and knowingly.[94]

17       The Supreme Court of Nevada affirmed, making a key factual finding:

18
19           In this case, Alford alleges that but for counsel's errors, he
         would have accepted a more lenient offer from the state.
20       Assuming that Alford's attorneys performed deficiently, we
         conclude that Alford has shown no prejudice because he fails to
         show that the state ever offered him a more lenient plea bargain.
21
22           Alford alleges that about two weeks before trial, his
         counsel told him that if he pled guilty to first-degree murder, he
23       would receive a life sentence with the possibility of parole.  The
         prosecutor represented to the district court that the state never
24       made such an offer.  As factual support for his allegation, Alford
         cites a hearing ten days before the second trial at which he told
25       the court that his counsel was "trying to convince me that I should
         plead to a first-degree murder conviction and that I would only
26       have to do three years on a ten-to-life."  Alford argues that the
         fact that the prosecutor was present and did not challenge his

27

28       [94]#27, Ex. 99, at 3, 8 & 9-11.

remark shows that the state made such an offer.  We disagree. The state did not need to respond to Alford's remark for two reasons.  First, the existence or nature of a plea negotiation was not at issue; Alford was expressing dissatisfaction with his counsel's preparation for trial.  Second, Alford's own counsel immediately responded to Alford's claim, calling it "absolute nonsense."

*We conclude that the record shows that the state never offered Alford a plea bargain in which it would recommend a sentence of one term of life in prison with the possibility of parole.* Therefore, Alford was not prejudiced by any failure of his attorneys to properly deal with the letters in question.

#27, Ex. 108, at 2-3 (emphasis added).

In his state post-conviction petition, Alford asserted, *inter alia*, claims that his trial counsel were ineffective for failing to review the letters sooner and for failing to move to exclude the letters on the basis of authenticity and reliability.  He maintained that the three letters were inadmissible because none of the letters were accompanied by a postmarked envelope, two of the letters did not have the name of the sender or author of the letter or a signature, one letter additionally was typewritten, and the only signed letter allegedly did not ask Ann Alford to lie.  He did not allege that counsel were ineffective for failing to make a more effective effort to exclude the letters as inadmissible other bad acts evidence.[95]

In his supporting purported affidavit, petitioner described an entirely different factual scenario regarding the pretrial plea discussions than he attested to in his prior declaration:

13.  That due to my frustration with [my] counsel's failure to communicate with me and participate in preparing my defense, on Monday, August 26, 1996, I personally called the District Attorney's Office and talked to [prosecutor] David Schwartz for 20 to 30 minutes.  During this conversation, I informed Mr. Schwartz that I would be willing to plead guilty to no more than Second Degree Murder.  At the conclusion of the conversation Mr. Schwartz stated that he had no problem with this plea and advised me to have Mr. LaPorta contact him to draw up the negotiations.

14.  That pursuant to Mr. Schwartz' instructions, I made numerous attempts to contact Mr. LaPorta by telephone and when he finally did talk to me, Mr. LaPorta refused to contact the

---

[95]See #27, Ex. 116, at 19-20 & 24-25; *id.*, Ex. 129, at 19-20 & 23-24.

DA and make the negotiations, stating that he didn't have the time and that if the DA would offer this then he would surely reduce the charge to a lower charge as we got closer to trial.

#27, Ex. 116, Ex. "D" thereto, at 3-4.[96]

In rejecting petitioner's claim, the state district court found that petitioner "was aware of the existence and substance of these letters primarily because he was the author, but also because he was present during testimony regarding the letters from Ann Alford and Sherry Rollins during his first trial."  The court concluded that Alford could not show both deficient performance and resulting prejudice because: (a) he had "presented no basis to expect the jury would not have heard about the letters regardless of the timing of their review by his defense counsel;" and (b) he could not "claim that he would not have pleaded guilty had defense counsel been more thoroughly prepared regarding the impact of these letters when the substance of the letters had previously been elicited at the first trial and all parties were aware and prepared for this testimony."  The court further noted that if Alford had gone to trial and been convicted there was a "high likelihood that he would have been sentenced, once again, to life without the possibility of parole."[97]

With regard to the alleged failure to challenge the admissibility of the letters on the basis of authenticity and reliability, the state district court held, *inter alia*, as follows:

> Furthermore, Defendant must show prejudice by his counsel's actions . . . .  Defendant has asserted no basis whatsoever for counsel to preclude the admission of the letters in question.  He has presented no legal theory counsel should have asserted and has not shown that even had such a motion been raised that it would have been meritorious.  This contention of ineffective assistance of counsel is meritless and thus, is dismissed.

#27, Ex. 119, at 7-8, ¶21.

---

[96]See also *id.*, Exhs. "G", "H" and "I" thereto (declarations by petitioner's mother, father, and an acquaintance attesting to his alleged statements that he had been offered a one life sentence with parole plea offer prior to the trial).  The Court notes again that these statements would be inadmissible hearsay to prove the truth of the matter asserted with regard to what, if any, plea offer was made prior to trial.

[97]#27, Ex. 119, at 2., ¶7, & 6, ¶¶ 14 & 15.

-47-

1    The state high court affirmed, holding that "Alford has not demonstrated that the district

2    court's findings of fact are not supported by substantial evidence or are clearly wrong."[98]

3    On federal habeas review, this Court will assume, *arguendo*, that the failure to review

4    and address the letters constituted deficient performance.  The issue therefore focuses on

5    the prejudice component of the *Strickland* test.  In this regard, petitioner claims that he was

6    prejudiced specifically by counsel's failure to move effectively to exclude the letters, failure

7    to prepare to defend against them, and failure to take the letters into account in plea

8    negotiations.  The Court will take up the prejudice issue for each claimed deficiency in turn.

9    Petitioner first contends that trial counsel was ineffective for failing to move effectively

10   to exclude the letters. Petitioner maintains that trial counsel did not "vigorously" challenge the

11   admission of the letters and that no motion was filed to challenge the authenticity of the letters

12   or their admissibility as other bad acts evidence excluded by N.R.S. 48.045(2).[99]  Petitioner

13   contends that N.R.S. 48.045(2) required prior notice by the State and a pretrial hearing.

14   To the extent that the claim is based upon an alleged failure to move effectively to

15   exclude the letters as other bad acts evidence, the claim is not exhausted.  Alford presented

16   no such claim to the state courts.  The Court exercises its discretion to proceed to the merits

17   of the unexhausted claim, however, given the late stage of these proceedings and the lack

18   of merit of the claim.  *See Granberry, supra.*  The Court will apply a *de novo* standard of

19   review to this particular claim because the state courts never considered, or were given the

20   opportunity to consider, the unexhausted claim on the merits.

21

22   [98]#27, Ex. 132, at 3-4.

23   [99]This Nevada evidence rule substantially tracks Rule 404(b) of the Federal Rules of Evidence,  and

24   provides as follows:

25       Evidence of other crimes, wrongs or acts is not admissible to prove
         the character of a person in order to show that he acted in conformity

26       therewith. It may, however, be admissible for other purposes, such as proof
         of motive, opportunity, intent, preparation, plan, knowledge, identity, or

27       absence of mistake or accident.

28   N.R.S. 48.045(2).

-48-

1    As petitioner acknowledges, the evidence that he presented on the motion to withdraw

2    guilty plea in the state court sought to establish that trial counsel did in fact challenge the

3    admissibility of the evidence under N.R.S. 48.045(2) in a chambers conference and that the

4    state district court rejected the challenge.  Quite critically, petitioner has not come forward with

5    any apposite Nevada authority establishing that an earlier and/or more "vigorous" challenge

6    based upon N.R.S. 48.045(2) would have produced a different outcome.  Nor can he, as the

7    available state authorities regarding Nevada evidence rules and federal authorities applying

8    substantially similar evidence rules do not support petitioner's position.

9    In *Evans v. State*, 117 Nev. 609, 28 P.3d 498 (2001), the Supreme Court of Nevada

10   addressed a claim that N.R.S. 48.045(2) barred admission of evidence that the defendant

11   attempted to influence the testimony of a witness, in that case via threats of violence.  The

12   witness testified that she was reluctant to cooperate with prosecutors because the defendant

13   had threatened her twice and she feared him.  The court rejected the proposition that N.R.S.

14   48.045(2) applied to bar evidence of such attempts to influence a witness' testimony:

15

16   . . . [W]e consider NRS 48.045(2) to be inapposite.
     Evidence that after a crime a defendant threatened a witness with
     violence is directly relevant to the question of guilt.  Therefore,

17   evidence of such a threat is neither irrelevant character evidence
     nor evidence of collateral acts requiring a hearing before its

18   admission.

19   117 Nev. at 628, 28 P.3d at 512 (footnotes omitted).  The court cited its prior decision in

20   *Abram v. State*, 95 Nev. 352, 594 P.2d 1143 (1979), which stated that "[d]eclarations made

21   after the commission of the crime which indicate consciousness of guilt, or are inconsistent

22   with innocence, or tend to establish intent may be admissible" and held that threats against

23   a witness may be admitted as evidence of consciousness of guilt.  95 Nev. at 356-57, 594

24   P.2d at 1145.

25   Federal cases applying similar evidence rules also conclude that evidence of attempts

26   to induce witnesses to lie is admissible evidence of consciousness of guilt.  *See, e.g., United*

27   *States v. Collins*, 90 F.3d 1420, 1428 (9th Cir. 1996); *United States v. Castillo*, 615 F.2d 878,

28   885 (9th Cir. 1980); *United States v. Brashier*, 548 F.2d 1315, 1325 (9th Cir. 1976).

-49-

1    Petitioner cites no apposite Nevada state case law contrary to the foregoing state and

2  federal authorities, which establish the admissibility of evidence of attempts to influence a

3  witness' testimony over a challenge under N.R.S. 48.045(2) or comparable federal evidence

4  rules.  The letters in question reflected a clear consciousness by Alford of the existence of

5  facts that tended to establish his guilt and of his effort to have his ex-wife lie on the stand to

6  conceal or contradict those inculpatory facts.

7    Petitioner thus cannot establish that, viewed objectively, there was a reasonable

8  probability that, but for the failure to challenge the admission of the letters more vigorously

9  as other bad acts evidence, petitioner would not have pled guilty and instead would have

10  insisted on going to trial.  It would appear that such a challenge to the letters would not likely

11  have resulted in their exclusion.  This aspect of the claim, on *de novo* review, thus fails to

12  establish a basis for federal habeas relief.

13    Turning to the claim that trial counsel was deficient for failing to seek the exclusion of

14  the letters on the basis of authenticity and reliability, petitioner similarly cites no apposite

15  authority tending to establish that the letters likely would have been excluded on a challenge

16  to their authenticity or reliability.  Mere supposition does not carry the petitioner's burden on

17  either state post-conviction or federal habeas review.  The state court's rejection of this aspect

18  of petitioner's claim for lack of any supporting legal foundation therefore was not an

19  objectively unreasonable application of clearly established federal law.

20    Petitioner next contends that he was prejudiced by counsel's failure to prepare to

21  defend against the letters.  He posits that the letters were "devastating to the defense" only

22  because trial counsel were "caught off guard" and then pressured him to enter a plea.  He

23  maintains that competent counsel would not have been surprised by the letters and "would

24  have known that other evidence would adequately support Alford's defenses."  Petitioner

25  refers to testimony by the babysitters establishing that he did not have a knife in his hand

26  when he entered the bedroom and allegedly establishing that he did not expect to discover

27  Ann Alford and Johnny Richardson in bed together; and he further points to testimony tending

28  to establish that Ann Alford and Frederick Alford had a continuing relationship at the time of

-50-

the killing.  Petitioner posits that "[i]n short, the letters did not eliminate Alford's defense and, even if admitted, their prejudicial impact could have been minimized," such that "the letters would not have been a bombshell causing the defense to collapse."[100]

Petitioner thus claims that defense counsel could have largely negated the impact of the letters with the countervailing evidence from the first trial if only they had reviewed and addressed the letters sooner.  This claim is problematic in two respects.

First, no competent evidence, as supposed to supposition or uncorroborated inadmissible hearsay, was tendered to the state courts[101] tending to establish that trial counsel were not prepared to bring out the countervailing evidence.  Indeed, with respect to Ann Alford's testimony, the evidence that petitioner offered in support of his motion to withdraw guilty plea tended to establish that Nancy Lemcke in fact had fully prepared a cross-examination of Ann Alford that would explore all of the points regarding her relationship with Frederick Alford.  Petitioner never has offered any competent evidence by anyone with personal knowledge tending to establish that defense counsel would not have been able to bring out all of the remaining countervailing evidence at the second trial.

Second, and more importantly, all of the countervailing evidence to which petitioner refers in fact was fully explored in his first trial.  This Court has canvassed the countervailing evidence at length in the background section of this order; and, viewed objectively, the evidence is not nearly as compelling as petitioner would suggest.[102]  Nor did the first jury find

---

[100]#53, at 14-16.

[101]N.R.S. 34.370(4) requires that affidavits, records, or other evidence supporting the allegations in the petition must be attached with the state petition.

[102]For example, the babysitters' testimony hardly establishes that Frederick Alford did not expect to discover Ann Alford and Richardson in bed together.  Rather, evidence -- including testimony from babysitter Michelle Smith -- that tended to establish that petitioner broke down the door would tend to establish exactly the opposite inference.  If Alford was expecting instead only to find Ann Alford in the bedroom, he would have had no reason to break down the door.  (Evidence further tended to establish that, before entering the trailer, Frederick Alford parked his vehicle immediately next to Richardson's vehicle. E.g., #23, Ex. 31, at 166-68; Ex. 32, at 152-53; #26, Ex. 83, at 52.)  Moreover, looking to the evidence overall, the forensic examination and autopsy of Richardson's body strongly suggested a concerted and sustained effort by Alford to take

(continued...)

-51-

1   it to be so.  At the end of that trial, Alford was found guilty of first degree murder with the use

2   of a deadly weapon; and he stipulated to imposition of two consecutive life sentences without

3   the possibility of parole to avoid the substantial potentiality of being sentenced instead to

4   death.

5         Petitioner thus posits that he would have insisted on going to trial based on evidence

6   that failed to carry the day in the first trial, without the letters, against a prosecution case

7   strengthened considerably by direct reliance on the letters.  Viewed objectively – which is the

8   governing standard – there is not a reasonable probability that a defendant in this situation

9   would have insisted on going to trial against a stronger case based on evidence that had

10  failed to persuade at the first trial, and risk the substantial possibility of again being sentenced

11  to multiple life sentences without any possibility of parole, when he instead could secure

12  sentences that allowed for possible parole.   That is, viewed objectively, the situation

13  presented would have been substantially the same if counsel had reviewed the letters before

14  trial.  The letters still would have improved the State's case dramatically, and the fact would

15  have remained that reliance on the countervailing evidence had not proved successful when

16  the case was tried to a jury without the letters.  The countervailing evidence certainly was not

17  reasonably likely to have *more* persuasive impact with the letters also in evidence.

18        The rejection of this aspect of Alford's claim on the basis that he could not demonstrate

19  prejudice accordingly was not an objectively unreasonable application of *Strickland*.

20        Petitioner next contends that he was prejudiced because his counsel "very likely" could

21  have negotiated a better plea if they had reviewed the letters before trial.  He alleges that an

22  offer had been made before trial pursuant to which he could have pled guilty to first degree

23  murder with a recommended sentence of life with the possibility of parole but that this offer

24  was "off the table" by the time that the defense learned of the State's use of the letters.  #21,

25  at 3; #53, at 17.

26  ───────────────────

27        [102](...continued)
    Richardson's life as opposed to either an accidental killing in a struggle or an instantaneous unpremeditated

28  act.  Going into both trials, Alford faced a quite strong case of premeditated first degree murder.

1    This claim and supporting factual allegation run directly contrary to the Nevada
2  Supreme Court's factual finding that "the record shows that the state never offered Alford a
3  plea bargain in which it would recommend a sentence of one term of life in prison with the
4  possibility of parole."[103]  The rule of deferential review of state court factual findings applies
5  to the factual findings of state appellate courts as well as to state trial court findings.  *See, e.g.,*
6  *Little v. Crawford*, 449 F.3d 1075, 1077 n.1 (9th Cir. 2006).  Petitioner has not attempted either
7  to show that the Nevada Supreme Court's factual finding constituted an unreasonable
8  determination of fact based upon the state court record or to overcome the presumption of
9  correctness attached to that factual finding.[104]

10    In all events, the contemporaneous state court record directly supports the Nevada
11  Supreme Court's factual finding and belies any allegation to the contrary.  It does not appear
12  that the following portion of the record has been cited previously in either the state or federal
13  post-conviction proceedings.  The following exchange occurred, in open court with the
14  defendant present, on the first morning of trial, October 21, 2006, prior to voir dire and thus
15  necessarily prior to the discussion of the letters in the State's opening statement:

16
17         THE COURT: Now, I'm going to have the jury brought
         down.  We'll start the jury selection.  But for the record, have
         there been any negotiations in the case?
18
         MR. SCHWARTZ: . . . . .
19

20    [103]#27, Ex. 108, at 3.

21    [104]The Court notes that petitioner's subsequent post-conviction purported affidavit directly contradicts
22  his sworn declaration in support of the motion to withdraw plea.  In the declaration, he attests that his counsel
    conveyed an offer to him from the State to accept a plea to first degree murder with a recommended
23  sentence of life with parole and that he decided to reject the offer.  In the purported affidavit, he attests that
    the State instead conveyed an offer directly to him to accept a plea to second degree murder and that his
24  counsel then refused to follow through with the deal after he decided to accept it.  The purported affidavit and
    the sworn declaration thus directly contradict each other.  Moreover, even if the purported affidavit did not
25  contradict his prior sworn and unsworn statements, the tale related in the post-conviction affidavit is fanciful to
    the extreme.  Petitioner posits that the state prosecutor took a collect call from an inmate at the Clark County
26  Detention Center and then spoke for twenty to thirty minutes with a represented defendant without his
    counsel being present.  His allegedly unprepared defense counsel then passed on the opportunity to get out
27  of the case on a plea to only second degree murder.  This fanciful tale piles extreme improbability upon
    improbability and tends to belie Alford's entire claim.  The remaining post-conviction declarations by his family
28  and a friend were hearsay as to any plea offered by the State.

-53-

1
2
3

> Since the remand, on my own motion I withdrew the notice of intent [to seek the death penalty] and I have since offered Mr. LaPorta to allow the defendant to plead guilty to first degree murder with a weapon; and we agreed to two sentences of life with the possibility of parole.

4

> THE COURT: Has that been rejected?

5
6

> MR. LAPORTA: Yes, your Honor.  I discussed all of that with Mr. Alford.  Mr. Alford believes it's in his best interest to go to trial, and that's what we're prepared to do.

7  #25, Ex. 78, at 11-12.  This exchange – from a time when there was no claim or dispute

8  involving the status of the plea negotiations – wholly belies all of petitioner's varying,

9  contradictory and at times fanciful descriptions of the plea negotiations before trial.  The

10 Nevada Supreme Court's factual finding is completely supported by the contemporaneous

11 record.

12     The state courts' rejection of this aspect of petitioner's claim therefore was not an

13 objectively unreasonable application of clearly established federal law.

14     Ground 1(d) therefore does not provide a basis for federal habeas relief.[105]

15     ***Ground 1(e):   Factual Basis for the Home Invasion and Subornation Pleas***

16     In Ground 1(e), petitioner alleges that he was denied effective assistance of trial

17 counsel when counsel recommended that he plead to charges of home invasion and

18 subornation of perjury without there being a sufficient factual basis for either charge.

19 _____

20  [105]Petitioner did not exhaust any claim in the state courts based upon a factual allegation that he was
21 denied a meaningful and informed opportunity to plead to two life sentences with possibility of parole by trial
    counsel's failure to review the letters before trial.  It is not necessarily a foregone conclusion that a plea with
22 two life sentences with the possibility of parole is a better deal than the plea that he entered.  If parole was not
    granted on either one of the two life sentences, he would be incarcerated for life.  Eligibility for consideration
23 for possible parole does not signify if or when one will be paroled from a sentence.  Further, in all events it
    would appear under the laws in force at the time that petitioner would be required to serve a combined
24 minimum twenty years before being eligible to be paroled from the second life sentence *if* paroled from the
    first life sentence at the earliest possible juncture.  *See,e.g., Wesley v. State*, 112 Nev. 503, 518, 916 P.2d
25 793, 803 (1996).  In contrast, on the sentences that he received, if paroled on the life sentence, his eventual
    release then would be assured, either by parole, diminution of sentence through good time credit, or, in all
26 events, by expiration of each determinate sentence.  Further, parole eligibility on non-life sentences generally
    is available in Nevada after expiration of one-third of the sentence less good time credits.  It thus is possible
27 that petitioner could achieve an earlier release under the sentences imposed than he might achieve under
    two life sentences with the possibility of parole, even if paroled at the earliest possible juncture on each life
28 sentence.  Petitioner in all events did not present a claim based upon any such factual allegation to the state
    courts, however.

1                  ***Ground 1(e)(1): Factual Basis for the Home Invasion Plea***

2             On the home invasion charge, petitioner contends that a sufficient factual basis for the

3 *Alford* plea was lacking because there was no evidence that he forcibly entered the trailer.

4             Under N.R.S. 205.067(1), "[a] person who, by day or night, forcibly enters an inhabited

5 dwelling without permission of the owner, resident or lawful occupant, whether or not a person

6 is present at the time of the entry, is guilty of invasion of the home."   "Forcibly enters" is

7 defined for purposes of the statute as meaning "the entry of an inhabited dwelling involving

8 any act of physical force resulting in damage to the structure."  N.R.S. 205.067(5)(a).

9             Petitioner accordingly contends that there was no evidence that he entered the

10 dwelling with "any act of physical force resulting in damage to the structure" sufficient to

11 sustain a conviction for, and support an *Alford* plea to, home invasion.

12             Petitioner was charged in an initial criminal complaint and amended criminal complaint

13 with home invasion.  The charge was dismissed in the state justice court, however, on the

14 basis that sufficient evidence of forcible entry was not presented at the preliminary hearing.

15 The State did not thereafter include the charge in the information prior to the first trial.[106]

16             On direct appeal after the first conviction, the Nevada Supreme Court's background

17 recital included the following statements:

18

19            The events on the morning of the killing were as follows: Alford arrived at his former wife's trailer home early in the morning

20 and engaged in a conversation with two babysitters who were in the living room.  He asked the babysitters if his wife was in the

21 bedroom, and they told him that she was.  *There is no evidence that at that time he had illegally entered the premises or that he was a trespasser.*

22                          . . . . .

23            The information initially charged Alford with the crime of forcible home invasion. . . . .  The State dismissed these charges

24 prior to the commencement of trial; and *it appears from the evidence that Alford entered the home peaceably and probably*

25 *with permission.*

26                          . . . . .

27

28        [106]#22, Exhs. 2, 3 & 4, at 38-39.  No argument is made that the discharge barred further prosecution.

> Alford knew the trailer home and had visited it before. He entered the home peaceably and began talking with the babysitters.

111 Nev. at 1412 & n.2 & 1413 n.3, 906 P.2d at 1412 & n.2 & 1413 n.3 (emphasis added).

At the second trial, before a plea agreement was reached, Metro crime scene analyst Michael Perkins testified for the State as the first witness. According to Perkins' testimony, the door jam and striker plate on the front door showed "a lot of wear and a lot of dents in the door jam area." The door could not be secured after the incident even when the handle was locked because "the door would just pop open" when he pulled straight out on the knob without turning it. With regard to the bedroom door, he observed that the top hinge of the bedroom door "was completely busted off" and "the bottom hinge on the door was just barely hanging onto the hinge, the screws," with the door leaning up against a wall. He further testified that "[t]here were some small wood splinters in the area around the bottom of the door that led me to believe that it was a fairly recent damage to that door." On cross-examination, he elaborated extensively as to the damage; and he testified that the door "looked like it had some force applied to it."[107]

During the plea colloquy, the State incorporated the record from the prior trial, which was presided over by the same judge. The State's proffer included the following:

> One [of the supporting witnesses] would be Ann Alford. She would testify that on December 22nd, 1991, she resided at 5103 East Judson. She was in bed that Sunday morning at about 7:30 or thereabouts in the morning. Her bedroom door was kicked open or kicked in, and the defendant appeared. . . .
>
> . . . . .
>
> Additionally the baby-sitters . . . will testify that the defendant forcibly entered the front door to that trailer, went into the bedroom, kicked or busted opened the door . . . .
>
> The evidence will show that there was structural damage *to one or both doors* in the trailer to support the home-invasion allegation. . . . .

#26, Ex. 84, at 16-19 (emphasis added).

---

[107]#26, Ex. 83, at 37, 43, 44-45, 51, 53-55, 60-64 & 66-68.

On state post-conviction review, petitioner contended that the absence of a factual basis for a plea to home invasion, due to the absence of any evidence of forcible entry, was established by the dismissal of the charge at the preliminary hearing, the statements by the Supreme Court of Nevada on direct appeal, and the underlying testimony of the babysitters.[108]

The state district court referred to the State's proffer that the babysitters would have testified "that Defendant forcibly entered the front door of the trailer" and that "there was structural damage to the doors of the trailer."  The court concluded on a related appellate ineffective assistance claim as follows: "The plea canvass and the prosecutor's proffer of evidence was relied upon by the court to show that there was a sufficient factual basis for accepting the plea to home invasion.  This Court finds the evidence proffered by the prosecution established a sufficient factual basis."  The state court accordingly denied the related trial ineffective assistance claim.[109]

The Supreme Court of Nevada affirmed without further particularized discussion of this claim on the basis that "Alford has not demonstrated that the district court's findings of fact are not supported by substantial evidence or are clearly wrong."[110]

The *dicta* on the first direct appeal notwithstanding, the state courts' rejection of this claim was not an objectively unreasonable application of clearly established federal law.

First, the State relied upon damage to "one or both doors" in its proffer.  There was testimony from which a rational trier of fact could infer both that the front door was forcibly opened by Alford and that there was resulting damage.  Both Rhonda Bower and Sherry Rollins testified that, before December 22, 1991, the front door could be opened with "a little force" or "some force."  Rollins further elaborated that, before the incident, Frederick Alford was able to open the door but neither she nor Ann Alford could do so.  In contrast, after the accident, investigating officers observed that the door opened readily.  Michael Perkins

---

[108]#27, Ex. 116, at 16-17 & 25-26; Ex. 129, at 24-26.

[109]#22, Ex. 119, at 3, ¶11, 5, ¶11, & 8, ¶¶ 22 & 23.

[110]#27, Ex. 132, at 3-4.

1  testified at the first trial that "the door would open right back up" and at the second that "the

2  door would just pop open."[111]  This testimony potentially supported an inference that Alford

3  entered the front door with sufficient force to damage the door and door jamb to the point that

4  the door thereafter was capable of being opened without the use of any force.

5       Second, there was ample evidence tending to establish that Alford used physical force

6  that resulted in damage to the structure in kicking or busting open the bedroom door.[112]  The

7  definition of "inhabited dwelling" under N.R.S. 205.067 includes "any structure, building,

8  house, room, apartment, tenement, tent, conveyance, vessel, boat, vehicle, house trailer,

9  travel trailer, motor home or railroad car in which the owner or other lawful occupant resides."

10  N.R.S. 205.067(5)(b).  Petitioner has cited no apposite Nevada state authority holding that

11  the act of forcibly busting open the bedroom door did not constitute either a continuation of

12  the original entry or a forcible entry into the room itself for purposes of the statute.

13       The state courts' rejection of the ineffective assistance claim therefore was not an

14  objectively unreasonable application of *Strickland*.

15       The *dicta* in the Nevada Supreme Court's decision on the first appeal does not lead

16  to a different conclusion.  The *dicta* suggests that there was no evidence that petitioner

17  illegally entered the premises or that he was a trespasser and that it appeared from the

18  evidence that he entered the home peaceably and with permission.  These statements simply

19  are wrong because they are directly refuted by the record at trial, which contained such

20  evidence.  There was testimony by Ann Alford that Frederick Alford did not have permission

21  to be in the trailer and was not welcome there, and the babysitters both testified that they did

22  not invite him over or give him permission to enter and that he walked into the trailer

23  unannounced.[113]  There further was evidence, reviewed above, supporting an inference that

24  force was required to open the front door prior to the attack, tending to establish that Alford

25  

26       [111]See text and record citations, *supra*, at 11-12 & 56.

27       [112]See text and record citations, *supra*, at 8, 10-13 & 56.

28       [113]See text and record citations, *supra*, at 6, 9, 10-11 & 12.

forcibly opened the door that morning and walked into the trailer, all without any invitation or permission by anyone.  The Nevada Supreme Court's *dicta* did not eliminate the evidence supporting the home invasion plea that in fact was in the record at trial.[114]

Ground 1(e)(1) accordingly does not provide a basis for federal habeas relief.

### Ground 1(e)(2): Factual Basis for the Subornation of Perjury Plea

On the subornation of perjury charge, petitioner contends that a sufficient factual basis for the *Alford* plea was lacking because there was no evidence that Ann Alford committed perjury and the completed (as opposed to attempted) crime of subornation of perjury requires, *inter alia*, actual commission of the crime of perjury by the person suborned.

The respondents have not provided any argument to the contrary that directly addresses the specific contention made in the claim.[115]

The claim appears to have merit under the Nevada case law cited to the Court.

In *State v. Pray*, 64 Nev. 179, 179 P.2d 449 (1947), the Supreme Court of Nevada considered, *inter alia*, the issue of whether an attorney who allegedly induced his client to lie under oath could be convicted of subornation of perjury based solely on the uncorroborated testimony of the client that she had lied, under a statute prohibiting conviction of a crime solely upon the uncorroborated testimony of an accomplice.  In holding that the uncorroborated testimony of the client was insufficient, the court stated:

> The perjury of Mrs. Bogdewicz [the client] is an essential element of the crime of subornation of perjury, of which the appellant has been charged and convicted, and it is our view, which we believe is supported by the great weight of authority, that the accomplice rule applies in the instant case, to preclude the conviction of the appellant upon the uncorroborated testimony of Mrs. Bogdewicz . . . .
>
> . . . . .
>
> The doctrine, which we believe to be supported by the weight of authority, and which we have above indicated we shall follow in the instant case, is . . . as follows: 'The completed crime

---

[114]The sufficiency of the evidence presented by the State at the preliminary hearing is immaterial.

[115]See #44, at 17-18.

1
2
3
4
5

of subornation of perjury consists of two essential elements,- *the commission of perjury by the person suborned*, and the willfully procuring or inducing him to so do by the suborner. Gen.St.1894, § 6379. As to the first element of the crime, the suborned and the suborner are principals by virtue of the statute (Id. § 6310), and necessarily each is the accomplice of the other; hence this element of the crime cannot be established by the uncorroborated evidence of the suborned (Id. § 5767). . . . .

. . . . .

6
7
8

It is clear, therefore, that in the instant case, the appellant, if he suborned Mrs. Bogdewicz, as she testified he did, was, by force of the statute, a principal as to the perjury itself, involved as an element in the crime of subornation.

9
10

It follows that the appellant could not properly be convicted of the crime of subornation of perjury upon the testimony of Mrs. Bogdewicz, uncorroborated as it was . . . .

11   64 Nev. at 203-05, 179 P.2d at 460-61 (emphasis added).  The statement of the rule that

12   commission of perjury by the person suborned is an essential element of the completed crime

13   of perjury clearly was material to the *Pray* holding and was not *dicta*.  In its own independent

14   research, the Court has not found any Nevada case law in any way holding or suggesting to

15   the contrary.

16   It further would appear that *Pray* is fully consonant with the prevailing common law rule

17   regarding subornation of perjury:

18
19
20
21

Another related offense recognized by the common law is "subornation of perjury."  A defendant is guilty of such offense when he induces another to commit perjury.  It is essential that such other person actually commit perjury.  If, for whatever reason, such other person is not guilty of perjury, the defendant cannot be guilty of subornation of perjury. . . . .

22   4 *Wharton's Criminal Law* § 580 (15th ed., updated 2006)(footnotes omitted).

23   There accordingly was no factual basis for petitioner's plea to the completed crime of

24   subornation of perjury, as Ann Alford did not commit perjury when he asked her to do so.  It

25   therefore was ineffective assistance of counsel for trial counsel to advise him to enter an

26   *Alford* plea to the charge when there was no factual basis for such a charge on the

27   undisputed facts.  The state courts' rejection of this claim thus cannot stand, whether

28   reviewed under a *de novo* standard or instead under the deferential AEDPA standard of

1   review.[116]  At bottom, there simply was no factual basis for a plea to a charge of subornation

2   of perjury.

3       Ground 1(e)(2) accordingly provides a basis for federal habeas relief, and the Court

4   will grant the petition for a writ of habeas corpus in part to the extent that it seeks to set aside

5   the conviction and sentence for subornation of perjury.

6       ***Ground 1(f):  Motion to Withdraw Guilty Plea***

7       In Ground 1(f), petitioner alleges that he was denied effective assistance of counsel

8   when counsel on the motion to withdraw guilty plea failed to present additional crucial

9   arguments in support of the motion, failed to request an evidentiary hearing and to call the

10  supporting witnesses to testify live in support of the motion, and failed to present additional

11  affidavits or witnesses in support of the motion to withdraw guilty plea.

12      The state courts rejected this claim on the basis that, *inter alia*, petitioner could not

13  establish prejudice because he had failed to establish that the result on the motion would

14  have been different but for counsel's performance.[117]

15      The state courts' rejection of this claim was not an objectively unreasonable application

16  of *Strickland*.

17  _____

18  [116]The claim presented in this Court may not have been fairly presented to the state courts and
    exhausted.  Petitioner alleged in the state courts that there was an insufficient factual basis for the

19  subornation plea only on the ground that the letters were not authenticated or reliable.  He did not allege that
    there was an insufficient factual basis for the plea because Ann Alford did not commit perjury. #27, Ex. 116,

20  at 26-28; Ex. 129, at 25-26.  The State, however, has not challenged exhaustion of this claim.  In any event, if
    the Court now were to proceed through a full analysis of, first, whether the claim is exhausted and, second,

21  whether the claim now would be procedurally defaulted in the state courts as untimely or successive, the end
    result of the analysis would be that petitioner can satisfy the fundamental miscarriage of justice exception to

22  the procedural default bar.  In the final analysis, he simply is not guilty of the completed crime of subornation
    of perjury; and his actual innocence of this particular crime satisfies the fundamental miscarriage of justice

23  exception to the procedural default bar.

24      Given that the respondents have provided no principled basis to conclude that a sufficient factual
    basis for a subornation of perjury plea existed, and further given the late stage of these proceedings, the

25  Court accordingly will not protract these proceedings further to conduct yet additional proceedings directed to
    unexplored possible issues of exhaustion and procedural default.  Any such proceedings would lead to the

26  conclusion that petitioner is entitled to relief on the claim notwithstanding any arguable failure to exhaust the
    claim and any procedural default.  If the merits of the claim were not reached by the state courts, due to a

27  lack of exhaustion, the claim then would be subject to *de novo* review rather than deferential AEDPA review.

28      [117]#27, Ex. 119, at 5; Ex. 132, at 3-4.

                                                -61-

1      This Court set forth the state court procedural history on the motion to withdraw

2  previously in connection with the discussion of Ground 1(d), *supra*.[118]  The motion to withdraw

3  sought to set aside the plea solely on the ground that Alford was denied effective assistance

4  of counsel by his counsel's failure to review the letters to his ex-wife before trial.  Petitioner

5  claimed that he was prejudiced because, if he had been properly and timely advised of the

6  impact of the letters, he could have accepted a pretrial plea offer to plead to a charge of only

7  first degree murder without a weapon enhancement with a single life sentence with the

8  possibility of parole.[119]

9      With respect to the failure to raise additional arguments, petitioner in essence alleges

10 that motion counsel should also have raised Grounds 1(a) and 1(c) in support of the motion

11 to withdraw.  That is, he alleges that counsel should have included claims that the plea should

12 be set aside because of ineffective assistance (a) in trial counsel's failing to challenge the

13 felony murder theory based upon double jeopardy and (b) in trial counsel's failing to

14 adequately communicate with him and prepare for trial.  The Court adopts its prior discussion

15 of these claims herein.  The state courts' rejection of this aspect of Ground 1(f) was not an

16 objectively unreasonable application of clearly established federal law, as it does not appear

17 from this Court's prior discussion of the underlying claims that, viewed objectively, there is a

18 reasonable probability that the inclusion of either Ground 1(a) or 1(c) in the motion to

19 withdraw would have changed the outcome on the motion.[120]

20     Petitioner next contends that motion counsel was ineffective for failing to request an

21 evidentiary hearing and to call the supporting witnesses to testify live in support of the motion.

22

23      [118]See text, *supra*, at 42-46.

24      [119]#26, Ex. 94.

25      [120]See text, *supra*, at 27-33 & 38-42.  The claim further is not exhausted to the extent that it alleges

26 that motion counsel should have included a claim that trial counsel was ineffective for failing to argue double
jeopardy.  Petitioner claimed in the state post-conviction proceedings only that motion counsel failed to raise

27 a claim that trial counsel should have argued that the amended information failed to provide adequate notice
of the felony murder theory. #27, Ex. 116, at 9.  The claim of a failure to raise a double jeopardy argument

28 was raised for the first time in this Court by federal habeas counsel.  See also text, *supra*, at 29-32.

Petitioner cannot establish prejudice on this aspect of the claim because the contemporaneous trial record belies and flatly refutes his core factual allegation that the State offered to allow him to plead to first degree murder with only a single life sentence with the possibility of parole. As noted previously in discussing Ground 1(d), on the first day that the case was called for trial, the State and defense counsel together advised the state trial judge on the record that the State had offered to allow Alford to plead to first degree murder with the use of a weapon with a recommendation of two life sentences with the possibility of parole. This contemporaneous exchange – from a time when there was no claim or dispute involving the status of the plea negotiations – wholly belies and refutes petitioner's claim. Petitioner thus was not prejudiced by motion counsel's failure to request an evidentiary hearing or to call the supporting witnesses live.[121]

---

[121]See text, *supra*, at 53-54.

Indeed, much of the potential witness testimony reflected in the exhibits attached to the motion to withdraw guilty plea did not in fact suggest to the contrary by admissible evidence. Neither Nancy Lemcke nor Jerome Dyer made any statement whatsoever in their declarations that the State offered to allow Alford to plead only to first degree murder with a single life sentence with the possibility of parole. #26, Ex. 94, Exhs. B & C thereto. Petitioner's federal habeas counsel asserts that "Alford's prior counsel (Ms. Lemcke and Mr. LaPorta) or the investigator (Jerome Dyer) would have verified that, two weeks before trial, the State offered a plea agreement in which Alford could have pled to first degree murder and received a single life sentence of life with the possibility of parole." #21, at 26. This statement by counsel is unsupported by any statement – sworn or unsworn – in the state or federal record *by* either LaPorta, Lemcke or Dyer stating such. Rather, federal habeas counsel refers to a declaration by *Alford* – not counsel or the investigator – stating that LaPorta said to him that the case could be negotiated on a plea only to the first degree murder charge and a single life with sentence. There is no statement *by LaPorta* that he would so testify. Indeed, quite to the contrary, LaPorta called this allegation "absolute nonsense" prior to trial. See text, *supra*, at 45.

Motion counsel additionally attached an unsworn report by a detention services officer, R. L. Juliano, stating why he placed Alford on suicide watch on October 23, 1996. In the course of the report, Juliano states that "Alford was afforded the opportunity to negotiate his charges from Life without possibility of parole to Life with the possibility of parole." #26, Ex. 94, Exhibit E thereto. It is highly questionable that the guard's cryptic statement, in a report directed to an entirely different concern, was definitively referring to imposition of only one life with sentence on the "charges." For example, he also refers to "Life without" in the singular in a situation where the starting point of the negotiation would have been two rather than one life without sentences. In any event, Juliano's statements as to what he thought he heard during trial as to what plea allegedly was offered prior to trial would have been inadmissible hearsay when offered to prove what plea was offered before trial.

That leaves only Alford's own declaration filed in support of the motion to withdraw plea as the sole non-hearsay testimonial evidence relied upon in support of the motion to establish the alleged offer by the

(continued...)

-63-

1    Similarly, Alford was not prejudiced by a failure to present additional affidavits or

2    witnesses in support of the motion to withdraw guilty plea.  In support of this claim, he

3    submitted declarations by his mother, Catherine Moses, by her friend, Sharon Morehouse,

4    and by Frederick Alford, Sr., his father.  Collectively, these witnesses attested that petitioner

5    and/or counsel told them at the time of the trial that the State had made a one life with offer

6    prior to trial.  The family members and friend further attested as to Alford's state of mind with

7    regard to the alleged pretrial and trial offers.[122]  Such testimony would have been inadmissible

8    hearsay when offered to prove what offer the State in fact had made before trial.  The

9    subjective state of mind testimony further would have been immaterial given that the prejudice

10   inquiry under *Strickland* is an objective one.  In all events, however, the core moving premise

11   of these witnesses – that the State had made a one life with offer before trial that Alford would

12   have accepted the offer if he had only known then about the State's planned use of the letters

13   – was belied and refuted by the contemporaneous record reflecting that the State instead had

14   offered to accept a plea to first degree murder *with use of a weapon* with *two* life with

15   sentences.  Alford thus cannot establish prejudice on this aspect of the claim.

16   Ground 1(f) accordingly does not provide a basis for federal habeas relief.[123]

17   ### *Ground 2:  Involuntary Plea*

18   In Ground 2, petitioner alleges that his plea was not knowing and voluntary due to

19   ineffective assistance of trial counsel as detailed in his Grounds 1(a) through 1(e), which he

20

21   [121](...continued)
     State to negotiate the case for a single life with sentence.  Even if Alford had testified live to the same effect,
22   such testimony would have been directly belied and refuted by the contemporaneous trial record reflecting the
     status of the plea negotiations.  Petitioner thus cannot establish prejudice.

23   [122]#27, Ex. 116, Petitioner's Exhs. "G", "H" and "I" thereto.  See also the discussion in footnote 121,
24   *supra*, regarding any possible testimony by Peter LaPorta.

25   [123]Petitioner's additional allegations in the federal traverse as to being "obviously confused" at the
     time of the plea, #53, at 21, were not contained in the first amended petition and further do not appear to be
26   exhausted.  Pursuant to Rule 15, petitioner must seek leave of court in a motion to file an amended petition in
     order to expand the pleadings after the State's answer.  The represented petitioner has not done so at any
27   point during the time that this matter has been pending for decision in this Court.  He may not raise new
     factual allegations challenging the conviction for the first time in the traverse and without first seeking leave to
28   amend the pleadings.

-64-

incorporates as if set forth *in extenso*.  For the reasons previously assigned with regard to Grounds 1(a) through 1(e), the Court concludes that the Ground 2 does not provide a basis for federal habeas relief except with regard to the subornation of perjury plea, as to which there was no factual basis for the completed crime of subornation of perjury.

### Ground 3:   Ineffective Assistance of Appellate Counsel

In the remaining claims in Ground 3, petitioner alleges that he was denied effective assistance of appellate counsel on the direct appeal from the second judgment of conviction following his plea.  In Ground 3(a), he alleges that he was denied effective assistance by appellate counsel's failure to argue that there was an insufficient factual basis for the home invasion plea.  Ground 3(b) was dismissed as unexhausted.  In Ground 3(c), petitioner alleges that he was denied effective assistance by appellate counsel's failure to challenge the state trial court's denial of the motion to preclude the felony murder theory because the charge was non-specific and violated the Double Jeopardy Clause.  In Ground 3(d), petitioner alleges that he was denied effective assistance by appellate counsel's failure to challenge the state trial court's denial of a motion to strike the deadly weapon enhancement on the ground that the knife did not constitute a deadly weapon under Nevada state law.

### Ground 3(a): Failure to Challenge the Factual Basis for the Home Invasion Plea

On state post-conviction review, petitioner raised a claim in both the state district court and the Supreme Court of Nevada alleging that he was denied effective assistance by appellate counsel's failure to argue that there was an insufficient factual basis for the home invasion plea.[124]

The state district court found that the evidence proffered by the State established a sufficient factual basis for the home invasion plea, and the court therefore concluded that appellate counsel acted with reasonable competence in not raising the issue on appeal.[125]

/ / / /

---

[124]#27, Ex. 116, at 15-18; Ex. 129, at 16-18.

[125]#27, Ex. 119, at 5, ¶¶ 9-11.

-65-

On appeal from the denial of post-conviction relief, however, the Supreme Court of Nevada addressed only a separate independent substantive claim challenging the factual basis for the home invasion plea without also addressing petitioner's separate and distinct ineffective assistance of appellate counsel claim challenging counsel's failure to raise that issue on the earlier direct appeal.  The state high court rejected the independent substantive claim on the basis that it had been waived by appellate counsel's failure to raise the claim on direct appeal.[126]

This Court will address Ground 3(a) *de novo* because it does not appear that the Supreme Court of Nevada directly addressed the merits of this exhausted claim as an ineffective assistance of appellate counsel claim.   In reviewing the claim, the Court incorporates its prior discussion of the related Ground 1(e)(1).[127]  Even if the Court assumes, *arguendo*, that appellate counsel's performance was deficient in failing to raise this issue, petitioner nonetheless cannot carry his burden of establishing resulting prejudice.  First, the testimony at the first and second trials potentially supported an inference that Alford entered the front door with sufficient force to damage the door and door jamb to the point that the door thereafter was capable of being opened without the use of any force.  Second, there was ample evidence tending to establish that Alford used physical force that resulted in damage to the structure in kicking or busting open the bedroom door, and petitioner has cited no factually apposite Nevada state authority holding that the act of forcibly busting open the bedroom door did not constitute either a continuation of the original entry or a forcible entry into the room itself for purposes of the home invasion statute.  He therefore cannot establish prejudice from the failure to raise the issue on direct appeal.

Ground 3(a) therefore does not provide a basis for federal habeas relief.

/ / / /

---

[126]#27, Ex. 132, at 2 n.3.  The court addressed other claims of ineffective assistance of appellate counsel but did not address this particular ineffective assistance claim.

[127]See text and record citations, *supra*, at 55-59.

1      ***Ground 3(c): Failure to Challenge Denial of Pretrial Motion as to Felony Murder***

2            In Ground 3(c), petitioner alleges that he was denied effective assistance by appellate

3      counsel's failure to challenge the denial of a pretrial motion to preclude the felony murder

4      theory because the charge was non-specific and violated the Double Jeopardy Clause.

5            This claim is not exhausted to the extent that petitioner alleges that appellate counsel

6      was ineffective for failing to challenge the denial of the denial of the pretrial motion on the

7      legal ground that it violated the Double Jeopardy Clause.   Petitioner presented no such

8      reliance on the Double Jeopardy Clause in the state courts, and the allegation that appellate

9      counsel should have challenged the denial of the motion on double jeopardy grounds appears

10     for the first time in petitioner's papers in federal court.[128]

11            Respondents, however, have not challenged exhaustion of this aspect of the claim.

12     As with Ground 1(a), the Court exercises its discretion to proceed to the merits of the

13     unexhausted claim, given the late stage of these proceedings and the lack of merit of the

14     claim.  *See Granberry, supra*.  The Court will apply a *de novo* standard of review to the claim

15     because the state courts never considered, or were given the opportunity to consider, the

16     unexhausted claim on the merits.

17            Petitioner can demonstrate neither deficient performance nor resulting prejudice based

18     on appellate counsel's failure to raise a double jeopardy challenge to the denial of the pretrial

19     motion.

20            First, as discussed further below with respect to the exhausted portion of Ground 3(c),

21     the challenge to the pre-plea denial of the pretrial motion was waived by the plea.  Appellate

22     counsel therefore did not render deficient performance in failing to raise the waived issue;

23     and, further, there is not a reasonable probability that raising the waived issue would have

24     changed the outcome on the appeal.

25            / / / /

26

27

28     [128]#27, Ex. 116, at 17; Ex. 129, at 18.  See also text, *supra*, at 29-32 (non-exhaustion of related Ground 1(a)).

1    Second, as discussed above under Ground 1(a), petitioner has failed to establish that

2   a double jeopardy challenge would have had a realistic chance of success.[129]   Accordingly,

3   appellate counsel did not render deficient performance in failing to raise the double jeopardy

4   issue nor was there a reasonable probability that raising the issue would have changed the

5   outcome on appeal.

6    Petitioner did exhaust the claim in Ground 3(c) that he was denied effective assistance

7   by appellate counsel's failure to challenge the denial of a pretrial motion to preclude the felony

8   murder theory because the charge was non-specific.  The Supreme Court of Nevada rejected

9   this claim on the following ground:

10              We also reject Alford's contentions that appellate counsel
        was ineffective for failing to argue the district court erred in
11       denying Alford's pretrial motions to strike the deadly weapon
        enhancement . . . and to preclude the felony-murder argument.
12       We conclude that appellate counsel had no reasonable likelihood
        of success on the merits of those issues because Alford waived
13       his right to raise them on appeal in entering his plea of nolo
        contendere.  See Kirksey v. State, 112 Nev. 980, 998, 923 P.2d
14       1102, 1113 (1996)("An attorney's decision not to raise meritless
        issues on appeal is not ineffective assistance of counsel."); Webb
15       v. State, 91 Nev. 469, 538 P.2d 164, 165 (1975)(holding that,
        generally, defendant who enters a plea has no right to appeal
16       events preceding it in the criminal process).

17   #27, Ex. 132, at 2 n.3.

18    Alford contends that the Nevada Supreme Court's decision rejecting this claim is not

19   entitled to AEDPA deferential review because the court failed to provide a rationale for its

20   decision.  Petitioner acknowledges that the court did in fact provide the rationale quoted

21   above.  He urges, however, that this waiver language was inapplicable to his case because

22   he claimed on direct appeal that his plea was invalid due to ineffective assistance of trial

23   counsel and an argument that trial counsel was ineffective for failing to adequately challenge

24   the felony murder theory was part of the ineffective assistance of trial counsel claim.

25    This argument is wholly meritless.  The waiver rule applied by the Supreme Court of

26   Nevada applied directly to the claim at issue – the claim that *appellate* counsel was ineffective

27

28       [129]See text, *supra*, at 32-33.

-68-

1   for failing to challenge the state court's denial of the pre-plea motion seeking to preclude the

2   felony murder theory.  Any challenge to the pre-plea denial of the motion was waived by the

3   plea, and it therefore was not ineffective assistance of appellate counsel to not raise that

4   issue on appeal.  That is an express rationale for decision explicitly rejecting the ineffective

5   assistance of appellate counsel claim.  Any claim having to do with ineffective assistance of

6   trial counsel had absolutely nothing to do with whether an independent substantive claim on

7   the earlier direct appeal challenging the state court's denial of the pretrial motion was waived.

8   Petitioner's suggestion to the contrary is wholly without merit.[130]

9        Petitioner provides no additional argument relevant to this claim.  The Nevada

10   Supreme Court's rejection of the claim was not an objectively unreasonable application of

11   *Strickland*.

12        Ground 3(c) therefore does not provide a basis for federal habeas relief.

13        ***Ground 3(d): Failure to Challenge Denial of Pretrial Motion as to Weapon***

14        The final remaining claim, Ground 3(d), is subject to substantially the same analysis

15   as the analysis of the exhausted claim under Ground 3(c).  In Ground 3(d), petitioner alleges

16   that he was denied effective assistance by appellate counsel's failure to challenge the denial

17   of a pretrial motion to strike the deadly weapon enhancement.  The Supreme Court of

18   Nevada, in the portion of its order quoted directly above under Ground 3(c), clearly rejected

19   this claim on the ground that "appellate counsel had no reasonable likelihood of success on

20   the merits [of the challenge to the pretrial ruling] because Alford waived his right to raise [the

21   claim] on appeal in entering his plea of nolo contendere."  Petitioner's argument that the

22   Nevada Supreme Court nonetheless did not provide an applicable rationale for its decision

23   is wholly without merit here as well.  Petitioner further argues the merits of the weapon

24   ─────────────────

25        [130]Petitioner further erroneously relies upon *Delgado v. Lewis*, 223 F.3d 976 (9th Cir. 2000), as
     holding that a state court rejection of a claim with no stated rationale is not entitled to AEDPA deference.
26   *Delgado* instead holds that the federal habeas review is *not de novo* and that the federal court must conduct
     an independent review of the record to determine, *under the AEDPA standard*, whether the rejection of the
27   claim was an unreasonable application of clearly established federal law.  223 F.3d at 982.  *Delgado* in all
     events has no application to the present case because the Supreme Court of Nevada clearly stated its
28   directly applicable rationale for rejecting the claim of ineffective assistance of appellate counsel.

enhancement issue, but he provides no principled and relevant argument in any way undermining the Nevada Supreme Court's conclusion that an appellate challenge to the pre-plea ruling was waived by the plea. The state high court's rejection of the claim of ineffective assistance of appellate counsel was not an objectively unreasonable application of *Strickland*.

Ground 3(d) therefore does not provide a basis for federal habeas relief.

IT THEREFORE IS ORDERED that, on the merits of the claims remaining before the Court, the petition for a writ of habeas corpus shall be GRANTED IN PART and DENIED IN PART, such that the writ is unconditionally GRANTED IN PART to the extent that the conviction and sentence imposed for Subornation of Perjury under Count III in the judgment of conviction filed on April 21, 1997, in *State of Nevada v. Frederick Edson Alford, Jr.*, Case No. C104872, in the District Court for Clark County, Nevada, hereby is VACATED IN PART, as to the conviction and sentence on the subornation charge only, and petitioner shall be released unconditionally from any and all actual or constructive custody under said conviction and sentence on the subornation charge only, including all collateral consequences therefrom. The writ is DENIED IN PART in that all other claims in this action that remain before the Court for a decision on the merits to set aside the convictions and sentences for first degree murder and home invasion shall be DISMISSED with prejudice. The convictions and sentences for first degree murder and home invasion under the April 21, 1997, judgment of conviction remain in full force and effect and are not affected by this Court's order and judgment.

The Clerk of Court shall enter final judgment accordingly.

DATED:  September 14, 2006

_____
KENT J. DAWSON
United States District Judge